[Civ. No. 7716. Second Appellate District, Division One.—October 2, 1933.]

C. E. WOODRUFF, Respondent, v. B. G. ADAMS, Appellant.

Andrew H. Rose and Edward Everett for Appellant.

Robert H. Dunlap and George R. Larwill for Respondent.

DESMOND, J., *pro tem.*—This is an appeal from a judgment of $5,074.94, rendered by the court sitting without a jury, in favor of the plaintiff, and from an order entered by another judge of the same court denying a new trial.

Defendant early in 1929 was the owner of a tract of land in the city of Los Angeles which he proposed to subdivide into building lots. He employed plaintiff to level the ground, grade streets within or bordering upon the tract and construct sidewalks and curbs on certain of the streets. The agreement of the parties was reduced to writing and fixed the price to be paid plaintiff for each item of the work, leveling to be reckoned on an acreage basis, yardage removal to be figured on the grading work, surface or linear measurements to govern the cost of oiling streets and the concrete construction. The streets to be improved were described in the contract as "all streets lying between Vermont and Hoover from 109th street to 111th street, also Baring Cross from 108th to 111th streets. (Note) 111th street from Baring Cross to Vermont avenue. All work on this portion of street to be figured in contract at the same rate as the other streets named in this contract, but owner reserves right to include same in this contract or leave out." The contract also contained the following:

"Owner agrees to sell to Contractor: 2 Tractors, 1 Road King, 3 Scrapers, 1 Scarafier and 1 Plow, in the same condition as machinery is today, at a total price of $1,500.00, which amount is to be deducted from said Contractor on completion of the work. Ownership of said machinery to remain in the name of Owner until final completion and acceptance of this Contract, at which time Owner will deliver a Bill of Sale for the machinery to Contractor. Said machinery to remain on Owner's premises until final settlement is made."

By the terms of the contract, payment for labor on the job was to be made once a week according to labor lists approved by the owner's engineer, one F. A. Smith, and if the amount of such payment did not exceed 75 per cent of the actual cost of the job to date, the difference between the labor bill and said 75 per cent was to be paid to the contractor, i. e., to the plaintiff. Any balance due on the job at time of its completion was to paid within 35 days thereafter. There were various conflicting provisions in the contract as to furnishing of labor and materials which need not be specially noted. The contractor was bound to prosecute his work until fully completed "without delay, except such as may be caused by weather conditions or other conditions beyond his control".

Plaintiff began work on the tract on February 12, 1929, and stopped work there March 16th, four weekly pay-rolls accruing meanwhile. Defendant was approximately one week late in meeting each of these pay-rolls except the last, and as to that payment both plaintiff and defendant were summoned to appear before the Department of Industrial Relations and payment was made in the early part of April. Defendant's engineer Mr. Smith testified at the trial that on the evening of March 14th defendant telephoned him from Arrowhead Hot Springs, where he was ill, saying that he had better have plaintiff stop work until he adjusted financial matters with him, a message which he delivered next day to plaintiff on the tract. The plaintiff testified that "Mr. Smith told me Mr. Adams called him up the night before and told him to have me discontinue the work out there until he made definite arrangements to pay for the improvements." Defendant did not deny that he discussed the negotiating of a loan with the various witnesses

who gave testimony to that effect, but stated that he did not mention the matter "of the procuring of a loan to Mr. Woodruff in connection with his going ahead on the contract. The loan had nothing to do with his going ahead. I had plenty of money to pay Mr. Woodruff. I believed and claimed that Mr. Woodruff had been submitting incorrect payrolls and was claiming money for materials in excess of the amount moved." Other conversations bearing on the cessation of work were before the court and from these somewhat conflicting statements and appropriate findings thereon, the trial court concluded that "the stoppage notice constituted a prevention of performance by plaintiff". In regard to work to be done on 111th Street, a public street, forming the southerly boundary of the tract, testimony of the plaintiff was as follows: "On or about February 15th I had a conversation with Mr. Adams concerning 111th street in the presence of my foreman, Mr. Lambert. Lambert said: 'Are we going to grade 111th street, take the rough grade out of 111th street?' and I says 'Well, that is up to Mr. Adams,' and he says, Mr. Adams says, 'Yes, we would just as well go ahead and take the grade out anyway for I intend to go ahead and put in 111th street at the same price that this contract was agreed on.'" Plaintiff also testified that the gross price for the job excluding 111th Street was $16,320.38 and including 111th Street $22,213.

The trial court found that if respondent had been permitted to complete his work he would have made all the improvements, including all of 111th Street where it bordered on the tract and which, on the testimony of an engineer called by plaintiff, would have netted a profit of $5,074.94, the profit not including all of 111th Street being estimated at $3,764. It is clear, therefore, that the court construed the words of the contract "from 109th street to 111th street" as meaning "to 111th street inclusive". Appellant claims error in this regard. However, we are not prepared to say this was an incorrect interpretation of the terms, in view of the careless use of prepositions (e. g., *from* 109th Street indubitably meaning *including* 109th Street) in this contract and considering the following proviso of the contract "Permits and Inspection Fees 111th street contractor will pay for Permits and inspection fees, if any, for work done on 111th street, being a street of record,

therefor belonging to the city. It may be necessary for owner to install heavier sidewalks and curbs than called for in this contract, in which event the price for said work will be 5c extra per lineal foot on curb only than the price called for in this contract for lighter curb.'' The words ''from'' and ''to'' may be given the meaning to which reason and sense entitle them, according to the circumstances of the case (*Stough* v. *Reeves*, 42 Colo. 432 [95 Pac. 958]; Words and Phrases, vol. 8, p. 6984), and in view of the conversation of February 15th, in which defendant expressed his intention to improve 111th Street, we feel that the court was justified in its finding that he thereby included the portion of 111th Street between Baring Cross Street and Vermont Avenue, concerning which the contract permitted him to exercise his election.

One of the conclusions reached by the court was that ''the contract . . . provides for the payment of labor claims as a dependent condition or covenant, and payment by defendant was an obligation to be performed concurrently with performance by defendant. That said contract is not an installment contract''; another ''that the notice to stop work until defendant procured a loan was a stoppage notice entirely unauthorized by the contract and that the defendant did not withdraw the said notice within a reasonable time or at all; and that the said stoppage notice constituted a prevention of performance by plaintiff''; another ''that the failure to pay labor promptly continued for over one (1) month and covering four (4) payrolls constituted an anticipatory breach going to the heart of the contract and justified the plaintiff in refusing to proceed further with the contract and asserting his right to anticipated profits''.

Appellant sets up five grounds of error predicated on the following contentions: (1) That payment of labor claims was not an obligation to be performed concurrently, and that this was not an installment contract; (2) that the appellant was at no time in default; (3) that the stop notice did not constitute prevention; (4) that 111th Street from Hoover Street to Vermont Avenue should not have been included by the court in estimating the profits that would have been derived by plaintiff if the job had been completed; (5) that there should have been deducted, from estimated profits as a credit to defendant, the sum of $1500

mentioned in the contract as the purchase price of the equipment.

For convenience we shall consider these contentions in reverse order. The fifth claim of error is not in our opinion well grounded. Prevention by defendant, found by the learned judge of the trial court, was equivalent to repudiation of the contract on his part, and having repudiated, he may not rely upon a condition of that same contract to escape liability as to any part of a money judgment, which through his initial fault does not become effective for more than three years. If the machinery in question still exists or is still in possession of appellant, it may be assumed that after so long a time it is worth considerably less in money than $1500, the price acceptable to both parties in 1929. For the principle herein involved see *Morrison* v. *Sycamore Canyon Gravel Co.*, 102 Cal. App. 536, 539 [283 Pac. 84]. Furthermore, as counsel for respondent remark in their brief, there was no counterclaim filed for this or any amount, no evidence showing tender of a bill of sale, nor was the work completed, the sole contingency upon which the agreement to sell was based.

We have already passed adversely on the fourth ground of appeal in ruling that the court committed no error by including 111th Street in its calculation. As to the third ground, that the stop order did not constitute prevention, we feel that in view of the fact that this respondent, on the testimony before the court, was ready, willing and able to continue with his work and was deterred therefrom solely by the defendant or his authorized agent and not advised to continue within the period of approximately four months that ensued prior to filing suit we have a case closely approximating in its facts the circumstances that obtained in *Crawford* v. *Pioneer Box & Lumber Co.*, 105 Cal. App. 760 [288 Pac. 694]. The language of the court, at page 767, in that case is peculiarly applicable to the situation here. ''The performance of the contract here depended wholly and entirely upon plaintiff's access to the lands of the defendant company. Such access being denied him, he could proceed no further. Just how far the notice to stop cutting timber had the effect of withholding or denying access to the lands was a question of fact as well as one of law. . . . All that distinguished plaintiff from a mere tres-

passer was the implied license of the defendant. The latter retained at all times control of the lands and the disposition of any timber thereon standing. Whether plaintiff was removed from the lands by actual physical force or merely by order the effect is the same.''

It may be noted also that in one of the cases cited by appellant it was held that prevention takes place not only where a positive affirmative act of prevention is performed by one of the parties, but also where a party ''has neglected to do some act without which the plaintiff could not in the nature of things go on with his contract; as *where he refused to furnish a place whereon to erect a building''*, etc. (*Palm* v. *Ohio & Miss. R. R. Co.*, 118 Ill. 217, 219.) This might be made to read, as applied to the present case, ''a tract whereon to do his grading and street improvement work''. It appears to us, therefore, that the trial court correctly concluded that plaintiff was prevented from completing his contract. ■ The second ground above mentioned, that appellant was at no time in default, is disposed of by our ruling on the third ground sustaining the trial court's view that prevention took place.

■ It remains only to determine the merit of appellant's claim ''that the trial court erred in concluding that the payment of labor claims was an obligation to be performed concurrently by the appellant and that the contract was not an installment contract''. If the conclusion means that defendant's failure to make payment of labor claims promptly in each of the four weeks of the working period constituted a breach of a condition precedent and that this is a severable contract (and no other meaning occurs to us) we feel that appellant's point is well taken. It is our opinion that here, as in the case of *Cox* v. (*McLaughlin*) *Western Pac. R. Co.*, reported first in 44 Cal. 18, at page 28, ''the contract . . . is an entire contract. The provision for the payment for the work, etc., from time to time, according to estimates to be made, does not change the character of the contract in that respect, and make it severable.'' The opinion by Mr. Justice Garoutte in *Proctor* v. *Arrowhead Reservoir Co.*, 100 Cal. 500 [35 Pac. 146], contains interesting references to the case of *Cox* v. *McLaughlin*, reported in 44 Cal. 18, 52 Cal. 590, 54 Cal. 605, 63 Cal. 196 and 76 Cal. 60 [18 Pac. 100, 9 Am. St. Rep. 164], and

points out the remedy available to the contractor when an employer fails to make payments as agreed, namely, rescission and an action for fair value of the work done.

Judged by the reasoning of the court in *Palm* v. *Ohio & Miss. R. R. Co.*, *supra,* quoted in *Cox* v. *McLaughlin*, 54 Cal. 605, 609, failure to pay promptly week by week under the contract before us would not of itself establish legal prevention. The excerpt is as follows: "A contract, no doubt, may be so drawn as to make the payment of a part of the consideration, by installments as the work progresses, or at stated times independently of the progress of the work, a condition precedent to the further prosecution of the work, and make its nonpayment such a substantial violation of the contract as to authorize the other party to abandon the work and sue upon it, as for having been prevented from completing it by the act of the party who had thus failed to perform such condition precedent. But the law cannot infer such a consequence from the ordinary obligation to pay money at a particular time, or upon a completion of a specified part of the work."

While, therefore, we conclude that the evidence does not support a finding that prevention arose through nonpayment of labor claims which, as a matter of fact, were all paid not later than early April, long before this suit for anticipatory breach was filed, it does not follow that there must be a reversal (24 Cal. Jur. 993, and cases there cited), for, as has been noted, the court found also "that on or about the 16th day of March, 1929, the defendant B. G. Adams notified plaintiff to stop work until he could procure a loan with which to complete his performance of the contract. . . . That defendant did not withdraw said stop order prior to the institution of this action."

While, as we have indicated, the failure to pay labor claims promptly did not constitute prevention, there is sufficient in the various findings reached by the court, and in the evidence offered, to support the conclusion that prevention resulted from the stop order and to sustain the judgment on that ground alone.

Judgment affirmed. The attempted appeal from order denying motion for a new trial is dismissed.

Conrey, P. J., and York, J., concurred.