[Civ. No. 16506. Second Dist., Div. One. Apr. 26, 1949.]

HUBERT E. ORTON et al., Plaintiffs and Appellants, v. EMBASSY REALTY ASSOCIATES, INC. (a Corporation), Defendant and Appellant.

Harvey A. Harkness for Plaintiffs and Appellants.

Gibson, Dunn & Crutcher and Gerold C. Dunn for Defendant and Appellant.

WHITE, P. J.—Plaintiffs' complaint herein contained two causes of action: the first, for damages, alleged a breach of contract by the defendants which made it impossible for plaintiffs to perform thereunder, and the second sought a sum of money alleged to be due as payments under the same contract. As to the first cause of action a nonsuit was granted, and on the second, judgment was entered in favor of plaintiffs for the sum of $952.75. Plaintiffs have appealed from the judgment against them pursuant to the nonsuit on the first cause of action, and defendants have appealed from the judgment against them on the second cause of action.

It appears that in October, 1945, plaintiffs were the owners of all the issued capital stock of Orlando Realty Company, the assets of which consisted almost entirely of real estate. On or about October 4, 1945, the parties entered into a written contract for the sale of all the stock to Embassy Realty Associates. Because of a difference of opinion as to the value of one of the Orlando properties known as 1501-25 East First Street, there was added to the contract a provision entitled "Contingent Addition to Purchase Price," the full text of

which appears below.* In substance, it provided that should the sellers, on or before September 1, 1946, secure an acceptable lessee for a term of 10 years or more at a rental of $10,000 or more per year, the purchase price would be increased by certain stated amounts depending on the amount of the annual rental under the lease.

In their first cause of action plaintiffs set forth the contract and alleged that in June, 1946, defendant sold the real property known as 1501-25 East First Street and thereby prevented plaintiffs from leasing said property and becoming entitled to the additional payment; that defendant, by rendering performance by plaintiffs impossible, damaged plaintiffs in the sum of $6,000.

The answer admitted the making of the contract and the unconditional sale of the property, but denied the remaining allegations of the complaint, and set up as an affirmative de-

---

*"(19) The parties hereto have agreed that in case the property known as 1501-25 East First Street is leased on or before September 1, 1946, for a term of ten (10) years or longer and for a rental of Ten Thousand Dollars ($10,000) or more per year, the purchase price hereunder shall be increased as follows:

"If the annual rental is Ten Thousand Dollars ($10,000) or more per year, and if no leasing brokerage is involved, Thirty-five Hundred Dollars ($3500.00) additional shall be paid the Sellers; or if the annual rental is Eleven Thousand Dollars ($11,000) or more per year, and if no leasing brokerage is involved, Five Thousand ($5,000) additional shall be paid the Sellers; if the annual rental is Twelve Thousand Dollars ($12,000) or more per year, and if no lease brokerage is involved, Six Thousand Dollars ($6,000) additional shall be paid the Sellers. In all three cases the amount stated to be paid to Sellers shall be in addition to the purchase price of $115,000 herein provided. If another broker than Embassy Realty Associates, Inc., is paid a leasing commission, an amount equal to one-half of Realty Board rate of commission for such lease shall be deducted from the aforesaid addition to purchase price.

"The sellers are to have the right as the agents of the Buyer until September 1, 1946 to negotiate but not to conclude a new lease for the aforesaid property and to submit such lease for the approval and execution of Orlando. If the terms of the lease so submitted are acceptable to Orlando and if the annual rental is $10,000 or more and if the lessee is either the Kansas City Macaroni and Importing Company or its subsidiary, Pacific Macaroni Company, with the guarantee of the parent company attached, or if the lessee is some other concern of equal responsibility or if in lieu thereof the lessee is a less responsible concern acceptable to the Buyer with a deposit of six (6) months rent in advance as security, then such lease submitted by the Sellers shall either be accepted and executed by Orlando or the Sellers shall be entitled to the additional purchase price which they would have been entitled to had it been so accepted and executed.

"In any case payment for the contingent addition to the purchase price aforementioned, if any, shall be made promptly upon execution of lease but in no case unless such lease is either executed or submitted for execution on or before September 1, 1946."

fense that the plaintiffs were real estate brokers; that the property was sold through one Max Jolles, a broker associated with plaintiffs; that plaintiffs intentionally or by want of ordinary care led defendant to believe that Jolles was acting as plaintiffs' agent in proposing the sale; that upon information and belief plaintiffs profited from the transaction through Jolles, and were estopped to claim a breach of the contract by defendant. As a second defense it was alleged that plaintiffs conferred actual authority upon Jolles to act as their agent in proposing the sale.

As to the first cause of action, appellants assign error "in refusing to accept testimony on intention; in rejecting offers of proof of value; in interpretation of the contract; and in granting a nonsuit." As to the first point, the record discloses that the trial court did accept evidence of the conversations of the parties in the negotiations which led up to the insertion of the provisions in the contract which are here under discussion. In connection with its assignment of errors appellants assert that the intention of the parties was that if the sellers could "demonstrate" greater value of the property by procuring a suitable lease, then they would be entitled to the added consideration.

The foundation of appellants' case on the first cause of action is that by their act in selling unconditionally the property prior to September 1, 1946, the defendants effectually prevented performance by the plaintiffs of the condition, to wit, securing a satisfactory lessee at $10,000 per year, which would entitle them to the additional "contingent addition to purchase price."

The defense position is that all that plaintiffs had was an agency, as brokers, to negotiate a lease, and that such an agency, unless accompanied by an exclusive right to sell or lease in the agent, leaves the owner free to make a sale or lease himself, without liability for a commission. (*Merkeley* v. *Fisk*, 179 Cal. 748 [178 P. 945]; *Snook* v. *Page*, 29 Cal.App. 246 [155 P. 107].) Defendants contend that "to become entitled to what was, in effect, a commission, plaintiffs must first have presented to the defendant a lessee meeting the requirements of Paragraph 19, or there must have been an acceptance of a lessee produced by either another agent or by the defendant, itself." In other words, the plaintiffs must allege and prove that prior to the sale by defendant they had produced an acceptable lessee ready and willing to enter into a lease.

■ It is our view that the analogy drawn by defendant between the contract situation here presented and that of a simple agency where a broker may not recover unless he procures a purchaser or lessee before the property is disposed of by the principal, is not well founded. It is true that the plaintiffs here were authorized as agents to negotiate a lease. They were not, however, to receive a commission as such agents for procuring a lessee, but were to receive an *addition to the purchase price* if a suitable lease was entered into or tendered before September 1, 1946, regardless of who negotiated it. The contract recites that the consideration for the sale of the stock of Orlando is $115,000 "plus such amounts as contingent additions to said purchase price as are hereinafter provided and minus such amounts as contingent deductions from said purchase price as are hereinafter provided." From a consideration of the contract itself and the intention of the parties as indicated by its terms, without resort to extrinsic evidence, it must be held that the buyer impliedly agreed to hold the property available for lease until September 1, 1946. To hold otherwise would be to do violence to the expressed intention of the parties that the sellers were to have until September 1, 1946, in which to bring about the contingency upon which the enhancement of the purchase price depended. A contract should be construed so as to give effect to all its provisions, if reasonably practicable. (Civ. Code, § 1641.) If defendant's position is correct, then it could with impunity have sold the property immediately upon acquiring it, thus giving plaintiffs no opportunity at all to perform.

By putting it out of its power to enter into a lease, the defendant effectively prevented performance by plaintiffs. Obviously, the plaintiffs could not, without being guilty of misrepresentation, secure from a responsible party a bona fide offer to lease property which the defendant no longer owned. "Each party to a contract impliedly agrees not to prevent the other party from performing or to render performance impossible by any act of his own." (17 C.J.S. 967.) Prevention of performance is equivalent to repudiation. (*Woodruff* v. *Adams*, 134 Cal.App. 490 [25 P.2d 529].) In *Bewick* v. *Mecham*, 26 Cal.2d 92, 99 [156 P.2d 757, 157 A.L.R. 1277], the court said:

"Each party to a contract has a duty to do everything that the contract presupposes that he will do to accomplish its purpose (*Epstein* v. *Gradowitz*, 76 Cal.App. 29, 32 [243 P. 877]; see Williston, Contracts (1937 rev. ed.) § 1293) and a

duty not to prevent or hinder performance by the other party. (*Tanner* v. *Title Ins. etc. Co.*, 20 Cal.2d 814, 825 [129 P.2d 383]; see Williston, op. cit., § 1293A; 4 Cal.Jur. 10-Yr.Supp. (1943 rev.)142.) . . . A party who prevents fulfillment of a condition of his own obligation commits a breach of contract (*Alderson* v. *Houston*, 154 Cal. 1, 13 [96 P. 884]; *Pacific Venture Corp.* v. *Huey*, 15 Cal.2d 711, 717 [104 P.2d 641]; *Carl* v. *Eade*, 81 Cal.App. 356, 358 [253 P. 750]; Rest., Contracts, § 315) and cannot rely on such condition to defeat his liability. (*Pacific Venture Corp.* v. *Huey, supra*; *Carl* v. *Eade, supra*, 13 C.J. 647; 17 C.J.S. 966, 12 Am.Jur. 885.)''

We come now to a consideration of the appeal taken by defendant from the judgment on the second cause of action. Paragraph 17(f) of the contract of sale contained the provision that the buyer will pay to the sellers the deferred sum of $24,400 owing on the purchase price in two equal yearly installments ''provided no liabilities undisclosed by the Balance Sheet have developed by said deferred payment dates.'' It appears that among the properties owned by the Orlando company were two business properties occupied by lessees under written leases which provided for prepayment of a portion of the rent. That is, at the time of the sale the Orlando company had already received from one lessee the rent for the last three months of one lease, or $675, and the rent for the last month of the other lease, in the sum of $250. The fact that the sellers had received in advance rent which ordinarily would be payable near the end of the term of the leases and thus be received by the buyer was not disclosed by the balance sheet. The balance sheet was attached as an exhibit to the contract of sale, and the sellers warranted its correctness. Upon discovering, shortly after the sale, which was consummated as of November 15, 1945, that these prepayments had been made, defendant buyer claimed the right to deduct them from the next installment due on the purchase price and did in fact deduct the sum of $925 from the purchase price installment due May 15, 1946. The trial court found only that under this provision of the contract defendants were indebted to plaintiffs in the sum of $952.75, with interest, and rendered judgment accordingly.

Defendant contends that the prepayments should have been shown on the balance sheet, according to good accounting practice, as ''liabilities,'' and further that the phrase ''liabilities undisclosed by the balance sheet'' is not ambiguous

and the court erred in admitting parol evidence concerning it. Plaintiffs argue that the prepayments should not appear on the balance sheet because the books of the Orlando Realty Company were kept on a "cash" basis; that the meaning of "liabilities" must be determined "not by looking in the dictionaries, but by reading the context, reviewing the transaction and taking note of the subsequent conduct of the parties who used the equivocal words." (*Erickson* v. *Grande Ronde Lbr. Co.*, 162 Ore. 556 [92 P.2d 170, 174, 94 P.2d 139].)

Defendant introduced expert testimony that a proper balance sheet taken from books kept on the "accrual" basis would show unearned rent as a liability, and that in a balance sheet based on books kept on a "cash" basis the fact that the assets included cash received as rent but not yet earned should be shown by a footnote.

Plaintiffs urge that the provisions of the contract clearly show that the items of unearned rent were not intended to be included in the phrase "liabilities undisclosed by the balance sheet"; that the terms of the contract show that what was meant was liabilities or claims of creditors or third parties against Orlando Realty Company; and that the trial court properly admitted parol evidence to determine the meaning of the phrase. In *Universal Sales Corp.* v. *California etc. Mfg. Co.*, 20 Cal.2d 751, at 770 [128 P.2d 665], it was said: " 'Liability' is a term which is frequently construed in the light of the surrounding circumstances to determine if it refers to all obligations accrued and contingent or only to some particular liability which the parties had in mind. . . . Relevant to the consideration of the parties' purpose in thus incorporating in their contract a provision manifestly susceptible of varied shades of meaning is the apt observation of Mr. Justice Holmes: 'A word is not a crystal, transparent and unchanged; it is the skin of a living thought, and may vary greatly in color and content according to the circumstances and the time in which it is used.' " The trial court admitted evidence that Mr. Maddock, president of defendant buyer, examined the two leases in question before the contract was executed and then discovered the prepayments of rent, and also admitted testimony by plaintiffs' bookkeeper that shortly after the contract was signed she advised an officer of defendant that the prepayments did not appear on the balance sheet.

We are in accord with defendant's contentions. The parties to this contract used the device of a balance sheet to show the financial condition of the corporation the stock of which

was being transferred. It cannot be disputed that proper accounting practice requires that unearned rent be shown as a liability on the balance sheet or be indicated in some way. The buyer was not taking over the corporation "as is," but in reliance upon warranties contained in the contract of sale, whereby the sellers warranted that all the facts, figures and statements in the documents attached to the contract were true; that the liabilities, exclusive of capital and surplus, shown by the balance sheet represented "the entire liabilities except capital liabilities of Orlando as at August 31, 1945," (with exceptions not here pertinent); and "that the financial condition of Orlando at November 15, 1945, the date of settlement hereinafter stated, *will not be less favorable* than that reflected in the Balance Sheet." In warranting the correctness of the balance sheet, the sellers must be held to have warranted its correctness as a statement of condition according to proper accounting practice. The fact that the sellers' books were kept on a "cash" rather than an "accrual" basis is of slight importance. The balance sheet itself purports to reflect the condition of the corporation on an "accrual" basis. It carries as an asset the item "prepaid insurance," and as liabilities "employee deductions," "deferred income," and "accrued taxes." We find nothing in the contract to indicate that the parties meant the word "liabilities" to mean something different from its usual accounting meaning. On the contrary, the use of the accounting device of a balance sheet attached as an exhibit to the contract indicates that the parties intended the balance sheet to represent truly the condition of the corporation according to standard accounting practice. There being no ambiguity or uncertainty to be explained, admission of parol evidence as to the intention of the parties was error. The language used in *Watson* v. *Fisher,* 79 Cal.App. 621 [250 P. 577], is here applicable:

"The rule regarding the admission of parol testimony covering the prior negotiations and understandings of the parties to a written contract is also well settled. When words of a doubtful meaning are used in a writing parol testimony is admissible to show the common meaning of the words used but it is not admissible to show the private understandings of the parties as to the meaning of such words. This rule is aptly stated by Mr. Justice Holmes in *Goode* v. *Riley,* 153 Mass. 585, 586 [28 N.E. 228], as follows: 'You cannot prove a mere private convention between the two parties to give

language a different meaning from its common one. . . . It would open too great risks if evidence were admissible to show that when they said five hundred feet they agreed it should mean one hundred inches, or that Bunker Hill Monument should signify the Old South Church . . . an artificial construction cannot be given to plain words by express agreement. . . .' ''

So here, where the contract shows that the word ''liabilities'' was used in an accounting sense, parol evidence may not be admitted to show that the parties to a contract, carefully drawn after prolonged negotiations, used the word in a sense wholly inconsistent with the aim of showing the financial condition of the corporation by means of a balance sheet.

The attempted appeal from the order granting defendant's motion for a nonsuit is dismissed. The judgment for defendant entered upon the order granting a nonsuit on the first cause of action is reversed. The judgment for plaintiff on the second cause of action is reversed. The parties to bear their own costs on appeal.

Doran, J., concurred.

Drapeau, J., did not participate herein.

A petition for a rehearing was denied May 13, 1949. Drapeau, J., did not participate therein. Opinion and judgment were modified May 18, 1949, to read as above. Defendant and appellant's petition for a hearing by the Supreme Court was denied June 23, 1949.