[Civ. No. 747. Fifth Dist. May 4, 1967.]

ROSS C. BLEY, Plaintiff and Respondent, v. AD-ART, INC., Defendant and Appellant.

Mazzera, Snyder & DeMartini, Robert A. Haughwout and Thomas E. Feeney for Defendant and Appellant.

Vaughan, Paul & Lyons, Varnum Paul and Warmke & Woodward for Plaintiff and Respondent.

GARGANO, J.—This action arises as a result of a warranty contained in a written contract in which the appellant purchased from respondent all of the issued and outstanding

stock of the National Neon Corporation, consisting of 15,000 shares. On January 25, 1962, when the sale was made, the corporation was engaged in the business of electrical contracting, and respondent, as its president, was actively engaged in its operation and management. Respondent was also the owner of all of the corporation's outstanding stock.

Under the terms of the contract of sale appellant agreed to purchase the shares of the corporation at the purchase price of $1.72 per share, making a total purchase price of $25,800. This purchase price was based upon the net worth of the corporation as revealed by its financial statements; $15,000 was payable on February 1, 1962, and the balance, to be evidenced by a promissory note bearing 4 percent interest, was due in three equal installments. Appellant paid respondent the sum of $15,000 on the due date, and it also paid the first installment. Thereafter, however, no further payments were made.

As part of the purchase price for the corporation's stock appellant also agreed to pay respondent the net profits made by the corporation during the period from April 1, 1961, to February 1, 1962. This obligation was also to be evidenced by a promissory note to be executed by appellant upon presentation by respondent of a closing statement of the corporation as of January 31, 1962. At the end of the period respondent presented a closing statement to appellant but appellant did not issue a promissory note and no payments on this obligation were made to respondent. Consequently, respondent brought an action in the San Francisco Municipal Court to recover the sum of $4,548.50, which he alleged was the net profit due and owing to him under the agreement. Subsequently, he also instituted an action in the Superior Court of San Joaquin County to recover the unpaid balance of the promissory note for the last two installments. By stipulation, the San Francisco action was transferred to San Joaquin County and the two causes were consolidated for trial. The consolidated cases were tried by the court sitting without a jury, and after a three-day trial judgment was entered in favor of the respondent in the principal sum of $10,051.61, together with accrued interest and $1,500 attorney's fees.

The controversy between the parties centers around the financial statements which were prepared by respondent and submitted to appellant in connection with the sale of the National Neon Corporation stock. The facts relating to this controversy, when viewed in a light most favorable to

respondent, are substantially as follows. During the course of negotiations and discussion which took place prior to the preparation and execution of a contract of sale, respondent permitted appellant to examine all of the books and records of the National Neon Corporation, and he also submitted to appellant financial statements dated March 31, 1961, October 30, 1961, November 30, 1961, December 31, 1961, as well as a financial statement for the period ending January 31, 1962. Thereafter, the agreement of sale was reduced to writing and executed by the parties. Among other things, this agreement provided: "With respect to each of said balance sheets Seller warrants that said balance sheet sets forth truthfully and correctly all of the assets of said corporation, and all of the liabilities of the corporation, and, further, warrants and represents that there are no liabilities of the corporation other than those that are set forth in the books of said corporation and which have been included in said balance sheets." At the time of the sale the corporation had only one job in progress of significance. This was the so-called "Holy Angels" job, which was begun in May 1961 and completed in September 1962. According to appellant, the job resulted in a loss to the corporation of $7,101, and neither this alleged loss nor any portion thereof appeared in the financial statements supplied by respondent to appellant. This was so because respondent did not anticipate a loss when he prepared the financial statements, and because the bookkeeping system used by the corporation since adoption in 1948, when it was set up by the accounting firm of Haskins & Sells, made no provision for reporting profits or losses for works or contracts in progress. Under this method of accounting, referred to as the "completed contract" method, entries for profits or losses for contracts or work in progress are recorded in the books only upon the completion of the contract or the work, or only when the information is known or available. Claiming that the warranty in the contract of sale for correct balance sheets or financial statements had been breached, the appellant filed a cross-complaint. Specifically, it demanded an offset, to the amounts claimed in the actions filed by respondent, for the alleged loss from the "Holy Angels" job. The trial court rejected appellant's claim and denied the offset.

Appellant's main contention for reversal of the judgment is that the evidence has established without conflict that the financial statements prepared by respondent, and which he submitted to appellant prior to the execution of the contract

of sale, were incorrect and thus that he breached the warranty which he made in connection therewith. However, in asserting this proposition appellant does not contend that the ''completed contract'' method of accounting employed by respondent was improper or an inaccurate method of accounting. To the contrary, the undisputed evidence is that there are two appropriate accounting methods to account for work or contracts in progress. These methods are the ''completed contract'' method which we have already mentioned, and the ''percentage of completion'' method which is much more complex and used primarily by large contractors. Under this latter method it is necessary to allocate profits and losses over the life of the contract, based on the percentage of completion. Hence, if we understand appellant correctly, it simply argues that financial statements must not be confused with bookkeeping methods, and therefore regardless of the bookkeeping method followed it is necessary to provide for losses on contracts in progress in the financial statemnets for the periods involved as soon as the losses become known, requiring a ''subsequent event'' adjustment to the financial statement if the losses do not become known until after the statement has been prepared. Appellant concludes that this is particularly true when the purchase price of the business is based on its net worth as in the instant case.

It is clear from the evidence that the financial statements, which were prepared by respondent and submitted to appellant when the contract of sale was executed, were prepared from the books and records of the corporation, and could only reflect the assets and liabilities set forth therein. Thus, it is *arguable,* from the plain language of the warranty that ''there are no liabilities of the corporation other than those that are set forth in the books of said corporation and which have been included in said balance sheets,'' that respondent merely warranted that the books and records were honestly and accurately maintained in accordance with standard accounting practices, and that the financial statements honestly and accurately set forth the assets and liabilities of the corporation as contained therein *or as known to the respondent as of that time.* Consequently, since the court determined that the ''completed contract'' method is a proper method of accounting, and since it also found that the corporation books and accounts were honestly and accurately maintained and that the financial statements were honestly

and accurately prepared therefrom, it is also arguable that the court properly concluded that respondent did not breach his warranty unless it is clear from the evidence that the parties intended this warranty to mean something more, i.e., *a liability which had arisen because of an existing contract for a job in progress although the liability was not known, anticipated* or ascertainable at the time the financial statements were made.[1]

■ In support of its contention that respondent's warranty included the ultimate loss resulting from the ''Holy Angels'' job, appellant, relying on *Orton* v. *Embassy Realty Associates,* 91 Cal.App.2d 434 [205 P.2d 427], and *Stafford-Lewis* v. *Wain,* 128 Cal.App.2d 614 [276 P.2d 157], argues that it is so because standard accounting practices required a retroactive adjustment of the financial statement when the loss became known to respondent. In this connection, appellant points to the testimony of Arnold Rue, a certified public accountant called by respondent, and Harry Magill, a certified public accountant called by appellant. Rue testified as follows:

''Q. Assuming that the method of accounting is the completed contract method, and further assume that after the completion of a particular contract a loss is recorded, what is the generally accepted accounting practice for determining the allocation as to the time of such loss?

''A. Well, of course, if you were using the completed job method I would say that as far as the bookkeeping is concerned that's the method—you wouldn't reflect any gain or loss on the job until the job is completed. And now as I recited for you, as far as your books are concerned you probably wouldn't have any particular allocation. However, if I were required to make a financial statement for some particular purpose and I knew that a loss had occurred, I would make some provision for it in the financial statement.''

Magill testified as follows:

---

[1]The evidence is undisputed that the ''completed contract'' method of accounting for work in progress is a proper and standard method of accounting. In fact, that very method was used by appellant under its own accounting system. Moreover, there is substantial evidence that the books and records of the National Neon Corporation were honestly and accurately maintained by respondent, and that the financial statements were accurately and honestly prepared therefrom. The ''Holy Angels'' job was only partially completed when respondent prepared the financial statements which he submitted to appellant, and he testified that he did not have any knowledge or reason to believe or any way to anticipate that the job would ultimately result in a loss.

"Q. When such a loss does become evident or should be anticipated, how much of the total loss immediately accrues?

"A. The entire loss accrues as of—theoretically as of the date the contract is signed, if it can be determined at that date, if you can determine the loss, because you are committed to a disastrous situation at that date. To say it another way, any loss at the moment it becomes known generally should be a pro rata share of that loss.

" " . . . . . . . . . . . . .

"Q. Knowing that there was an ultimate loss on such a job that was not entered in the financial statement, would you be able to certify that financial statement?

"A. May I rephrase the question?

"Q. Yes.

"A. Knowing now that there was a loss sustained on a job in progress at a given date, I could not accept those financial statements without a provision for loss.

"Q. And knowing what the total loss is now, what percentage would you have to have immediately before you could certify it?

"A. The full amount of the loss."

It is evident that Mr. Rue's testimony is not conclusive and simply indicates that he would make provision in a financial statement for a loss resulting from a contract in progress even when the "completed contract" method of accounting was being used if he knew that a loss had occurred or was going to occur. On the other hand, Mr. Magill's testimony indicates that when a loss subsequently results from a job which is in progress when a financial statement is prepared, an appropriate adjustment must thereafter be made in the financial statement. It is evident, however, that it is necessary to do so when the information is available in order to properly evaluate the condition of the business, whether it be done by correcting the previous balance sheet or by an appropriate notation thereon, or by some other accounting procedure. Mr. Magill also testified that he would not certify as correct a previously made financial statement with present knowledge that a job in progress had resulted in a loss. It is also evident that an accountant, armed with information which has changed the financial picture of a business, cannot thereafter certify the original statement as correct. This is not tantamount to saying, however, that the original financial statement was incorrectly prepared. To the contrary, even Mr. Magill admitted that under the "completed contract" method of account-

ing a loss resulting from a job in progress could not be shown in the financial statement unless the loss was actually *known* or *contemplated* at the time that the statement was prepared. Thus, it is manifest that the expert testimony relied upon by appellant does not settle the issue, but at best casts some doubt as to what the parties actually intended by the warranty contained in their contract. This doubt was resolved by the trial court in favor of the respondent, and we conclude that there was substantial evidence to support its decision, bearing in mind that in making this determination we do not weigh the evidence, judge the credibility of the witnesses or resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom (*Overton* v. *Vita-Food Corp.*, 94 Cal.App.2d 367 [210 P.2d 757]).

As we have stated, it is obvious from the evidence that respondent prepared the financial statement which he submitted to appellant from the corporation's books and records, and hence it was reasonable for the trial court to find that he simply intended to warrant that the books and records were honestly and accurately maintained, and that the financial statements were honestly and accurately prepared therefrom. In fact, that this was the intent of both parties is also evidenced by the clear language of the warranty itself which provides that ''it is understood that the buyer made no verification of such statements, but is relying thereon.'' In other words, from this clause, the court could reasonably find that in pointing out that it had not verified the financial statements (obviously with the corporation books and records and with other available information), appellant was relying on respondent's veracity that he was not withholding any information which would have changed the financial picture of the corporation, and which would have been discovered had the verification been made. It is manifest that under the respondent's bookkeeping system such a verification would have only disclosed that the ''Holy Angels'' job was a job in progress (and nothing more), and this fact was apparently already known to appellant. Moreover, appellant had examined the books and records of respondent prior to the time that the contract was prepared, and presumably knew that the respondent was using the ''completed contract'' method of accounting for work in progress, and presumably knew that there would be no information in the corporation books as to whether the ''Holy Angels'' job would result in a profit or loss until the job was completed. Consequently, the court

could reasonably find that if it had intended to protect itself from this loss it could have expressly so stated in the contract. In short, the parties could have expressly provided that the seller warranted that the as then uncompleted ''Holy Angels'' job would not result in a liability; and the court could reasonably find that failure to do so negates appellant's contention. ■ Finally, it is undisputed that under the ''completed contract'' method of accounting neither profits nor losses for contracts in progress are shown on the books until the contract is actually completed. Therefore, if appellant's argument is carried to its logical conclusion respondent would have been entitled to the profit resulting from the ''Holy Angels'' job if a profit had been realized from this job. In fact, since the purchase price of the corporation was based on its net worth, arguably respondent would also have been entitled to a credit for allowed contingencies which did not actually materialize. In this respect, the evidence shows that several reserves had been set up in the books for contingencies which did not occur, and if appellant's contention concerning the net worth of the business is carried to its logical conclusion respondent would also be entitled to the savings which resulted when these contingencies did not occur. The court was justified in not believing that this was the intent of the parties.

We also believe that the facts of this case are somewhat analogous to the facts presented to the court in *Moser* v. *Keller* (Mo.) 303 S.W.2d 135. In that case the provisions of a trust agreement gave a bank an irrevocable option to purchase all stock of the bank constituting the trust assets at book value. The book value was to be determined by deducting from all the assets of the bank all of its liabilities as shown by the books of the bank. Under the accounting method used by the bank interest earned but not yet received was not listed as an asset on the books of the bank. This was a recognized method of accounting for such interest, although another equally recognized accounting method listed earned but not yet received interest as an asset. The sellers of the stock protested that the book value based on its method of accounting did not truly and correctly reflect the assets of the bank, and contended that the book value was understated. The court in upholding the bank's position stated (*Moser* v. *Keller, supra,* at p. 140) : ''After a careful consideration of the language used in the trust instrument, in the light of the evident

purpose to be accomplished by its use, and after having considered the authorities cited by the parties, we are of the view that the words 'books of said National Bank' as used in the context above quoted meant: the books of the bank which correctly reflected all the assets and all the liabilities of the bank in accordance with the accounting system consistently used by the bank, provided that the accounting system consistently used was recognized in the banking business as an acceptable and approved system.'' The cases of *Orton* v. *Embassy Realty Associates, supra,* 91 Cal.App.2d 434, and *Stafford-Lewis* v. *Wain, supra,* 128 Cal.App.2d 614, cited by appellant in support of its contrary position are distinguishable. In *Orton* the balance sheet failed to disclose an existing liability of $925. The liability consisted of advance rents which had been received but were not shown as a liability. The undisputed evidence showed that the only proper method of accounting for advance rents which had been received was to show them as a liability. The court, after finding no ambiguity, held that the parol evidence rule precluded the defendant from proving that the term ''liability'' was intended to mean something other than as used in standard accounting practices. In *Stafford-Lewis* the balance sheet did not list or otherwise account for two promissory notes which obligated the corporation to pay the amounts specified in the notes to the payee thereof on demand. The court concluded quite properly that there was a breach of warranty.

In any event the trial court found that the loss which ultimately resulted from the ''Holy Angels'' job was not caused by respondent but by appellant. Thus, even if it is assumed *arguendo* that appellant's contention concerning the nature of respondent's warranty is correct, it cannot prevail on this issue if this finding of the trial court is supported by substantial evidence.[2] This follows for appellant's theory of breach of warranty assumes that the loss resulting from the ''Holy Angels'' job was a liability of the corporation which was in existence when the contract of sale was executed, even though it was not discovered until eight months later. Conse-

---

[2]The court's finding of fact in this respect reads as follows:

''The ultimate loss on the Holy Angels job was not caused by plaintiff, and was caused by defendant AD-ART, INC. Plaintiff Ross C. BLEY was not in control of the NATIONAL NEON CORPORATION after January 31, 1962, nor was he in control of the Holy Angels job after that date. Defendant AD-ART, INC. was exclusively in control of the Holy Angels job after January 31, 1962. Defendant AD-ART, INC. and not plaintiff, Ross C. BLEY, negotiated the charges for the ''extras'' on the Holy Angels job.''

quently, it was not only incumbent upon appellant to prove that the loss resulted from the job, but it was also incumbent upon appellant to prove that the loss was attributable to the original electrical contract or to events which had already transpired when the financial statements were prepared by respondent. In other words, it was incumbent upon appellant to prove that the ''Holy Angels'' job was already destined to result in a loss when the financial statements were prepared by respondent. In fact, since appellant's claim for an offset was raised by cross-complaint it was required to do so by a preponderance of the evidence.

We have examined the record and we conclude that the trial court was justified in deciding that appellant did not meet its burden of proof on this issue, and it is also evident that there was substantial evidence to support its finding that ''the ultimate loss on the Holy Angels job was not caused by plaintiff (respondent) and was caused by defendant (appellant).'' In the first place, the ''Holy Angels'' job was not audited until sometime in 1964, and by then the primary records, consisting of the time cards and material invoices, were no longer available. Hence, appellant's accountants were unable to make a certified audit. In the second place, the job was only partially completed when the contract of sale was executed (according to the court's finding, only 53.8 percent as to labor and 54.5 percent as to materials), and appellant was in control of the job for a period of approximately eight months thereafter. During this period there were two primary sources of trouble, one being the inadequacy of the engineering attributable to the general contractor, and the other being numerous changes ordered by the architect, requiring many extras. These extras were not all paid for by the contractor and in turn resulted in substantial compromises and settlements. Furthermore, matters were complicated by the death of Lloyd Sheppard in June or July 1962 during a critical period of the contract. Mr. Sheppard was the manager of the electrical division of the corporation and was in complete charge of the ''Holy Angels'' job. Consequently, his absence may have well contributed to some of the problems which caused the loss.

Appellant argues that respondent was nevertheless responsible for the loss because he remained in the employ of the National Neon Corporation after he sold his stock to appellant, and directed the work on the ''Holy Angels'' job. This argument is entirely without merit. During the period in

question respondent was no longer acting as a stockholder and owner of the corporation. To the contrary, the ownership of the stock had been transferred to appellant and appellant was in control of the affairs of the corporation. Thus, respondent was simply acting as its employee and appellant's claim of offset was not based on respondent's negligence as its employee or any similar theory.

Appellant's final contention is that the trial court failed to make findings on material issues raised by the pleadings and the evidence. In this connection, appellant asserts that:

1) The trial court made no finding as to whether or not respondent has warranted the correctness of the balance sheets, . . .

2) The trial court made no finding on the ultimate issue of breach of warranty, . . .

3) The trial court made no finding as to what standard accounting practice is in connection with making provision in balance sheets for losses on jobs in progress, . . .

4) The trial court made no finding as to whether or not the balance sheets submitted to appellant contain a provision for losses on jobs in progress, . . .

5) The trial court made no findings that the "Holy Angels" job was a job in progress during the period covered by the balance sheets, or that such job suffered a loss, . . .

6) The trial court made no finding that, in view of the ultimately-determined loss on the "Holy Angels" job, the balance sheets are incorrect in the absence of a provision therein for such loss, . . .

It is of course settled that findings of fact must be made on all material issues. It is equally well settled, however, that it is not necessary to make specific findings as to each of several material issues where the findings, taken as a whole or construed together, clearly show that they include the court's conclusion upon the material issues (*Petersen* v. *Murphy,* 59 Cal.App.2d 528 [139 P.2d 49] ; *Bowers* v. *Union Trust Co.,* 117 Cal.App. 259 [3 P.2d 614] ). Moreover, a specific finding is not required on an issue where it follows by necessary implication from a general finding (*County of El Dorado* v. *Al Tahoe Inv. Co.,* 175 Cal.App.2d 407 [346 P.2d 205] ).

And, finally, it is also settled that where proper findings have been made upon the various issues of the case it is not necessary to negate issues contradictory thereto. The finding on a particular issue is an implied negation of all contradictory propositions (*Kux* v. *Cal-West Lbr. Corp.,* 162 Cal.

App.2d 500 [328 P.2d 240]; *Lattanzi* v. *San Moritz Club*, 202 Cal.App.2d 546 [20 Cal.Rptr. 847]).

 The court expressly found that National Neon Corporation had one job in progress—the "Holy Angels" job—when appellant purchased its stock from respondent on January 25, 1962, and that this job was 53.8 percent completed .as to labor and 54.5 percent as to material. Thus, the court impliedly found that the "Holy Angels" job was a job in progress during the period covered by the balance sheets. Moreover, the court expressly found that the accounting methods used by National Neon Corporation in the preparation of its books, records, balance sheets and papers, were customary and usual in the trade and were consistently used by National Neon from its inception. Implicit in this finding is a finding that the "completed contract" method of accounting for work in progress is a standard accounting practice in the trade. Finally, the court found that the books, records, balance sheets and papers of National Neon Corporation accurately and correctly showed all of the assets and liabilities of the corporation, and that nothing was omitted from the balance sheets, books or records which should have been included in them. Implicit in this finding was the finding that a warranty of correctness of the balance sheets had been made (a fact never in dispute between the parties and conceded by respondent), and that this warranty was not breached. Also implicit in the finding is that proper accounting practices and principles were followed in connection with respondent's books, records, papers and balance sheets.

For the foregoing reasons, the judgment is affirmed.

Conley, P. J., concurred.