[Civ. No. 20423. Second Dist., Div. Two. Nov. 10, 1954.]

CARLA STAFFORD-LEWIS, Appellant, v. PHILIP WAIN et al., Respondents.

Joseph J. Cummins for Appellant.

Mitchell, Silberberg & Knupp and Guy Knupp for Respondents.

FOX, P. J.—In this action plaintiff seeks to have an agreement for the purchase and sale of the entire stock of a corporation which she owned, together with her option to repurchase such stock, declared a usurious loan. Defendants

by cross-complaint demand that their title to this stock be quieted and that they recover the amount they were required to pay on account of two promissory notes executed by plaintiff on behalf of her corporation but omitted from the balance sheet furnished defendants. Plaintiff appeals from an adverse judgment on all issues.

Plaintiff has been engaged for many years in the exploration and production phases of the oil industry, principally in the Wilmington field in California, where she had 11 wells, and the Centralia, Illinois field, where she had three. She operated through the Selegna Petroleum Corporation, hereinafter referred to as Selegna. She owned all of its issued capital stock. In 1946 she ventured into the Tejon field in California but without success; in fact, she sustained substantial losses in that operation. In about February, 1948, plaintiff secured a loan from the Empire Trust Company of New York in the amount of $285,000, to be repaid in monthly installments from the production of Selegna's wells. When this loan was being arranged the trust company required an independent audit of the books of Selegna, and designated three Los Angeles firms of certified public accountants for the task, any one of which would be acceptable to it. One of these firms was Philip Wain and Company. At that time Maurice Mac Goodstein was attorney for plaintiff and Selegna. He was acquainted with Mr. Wain and as a result of his recommendation Mr. Wain's company was selected to make the audit for Empire Trust. Since that time the firm of Wain and Company has continued as the official auditor for Selegna.

Later plaintiff secured a personal loan of $70,000 from Frank E. Hurd, pledging all the stock in Selegna as security therefor. This loan being long past due, Hurd, early in 1951, employed counsel who brought an action to foreclose on the security and to enforce payment of the loan. The foreclosure sale was set for February 19. Plaintiff was in New York attempting, but without success, to negotiate a new loan with which to repay Hurd. Realizing plaintiff's precarious financial position, Goodstein, who was still her attorney, telephoned Wain to inquire whether he could "help refinance or bail her out of this situation." After ascertaining that plaintiff required $115,000 and wanted an additional $10,000 with which to do some remedial work on the wells, Wain discussed the situation with some of his friends and advised Goodstein that "he and his associates were not interested in making a loan because they didn't want ordinary income, and that the

loan would be usurious"; that they were "only interested in a transaction wherein they could realize capital gains." A sale with an option to repurchase was then suggested, apparently by Goodstein. Wain inquired of him "if that would be legal." Goodstein expressed the opinion that "it would" and "cited him a case" in support thereof. Wain, according to plaintiff's testimony, also advised her that "his clients were not interested in making a loan"; that they were interested in getting a capital gain; that the deal would have to be a sale with an option to repurchase. When she protested selling Selegna Wain told her "that is the only basis on which I can handle it." Plaintiff thereupon left Wain's office and went to see her attorney, Goodstein. After a conference Goodstein, according to his testimony, called Wain and said to him: "I have recommended to Mrs. Lewis that she sell Selegna, the stock in Selegna, as long as there is a written option to repurchase the stock." Wain, who represented his associates and with whom all negotiations were carried on, replied "that would probably be satisfactory, that he would talk to his associates and call [him] back." As a result of a further telephonic conversation with Wain, Goodstein commenced the preparation of the papers to consummate the deal. He was directed, however, to submit his papers to attorney Paul Ziffren, who represented Wain and his associates, Rosenus and Shane, in the transaction. The result was that Ziffren prepared the agreement for the purchase and sale of the stock and Goodstein prepared the option to repurchase. The purchase price was $125,000. The option to repurchase had seven months to run but need not be honored by the optionor until the expiration of six months from the date of its execution on February 17, 1951. The option price was $175,000. The purchase and sale agreement recited that "the Seller has been fully advised by independent counsel." At the end of the document was the following: "I hereby certify that I am familiar with all details of this agreement and that I have advised the seller in this transaction fully as to her rights and liabilities. . . ." This statement was signed by Goodstein, plaintiff's attorney.

The parties met at the bank on February 17 to close the deal. Those present were plaintiff and her attorney, Wain, Rosenus and his wife, Shane and Ziffren. This was the first meeting of plaintiff and Rosenus and Shane although she and Goodstein had been advised by Wain that he had associates in the deal. Ziffren explained to plaintiff the purchase and

sale agreement which he had prepared and read to her most of its provisions. He explained to her that although his clients, as owners of all the stock of the corporation, had the right to elect a new board of directors immediately and remove her from the board, that if she was agreeable to having the by-laws amended to require all action to be unanimous, they would not insist upon her resignation at that time, and the election of an entirely new board. She was advised by Goodstein that this request was reasonable. At Ziffren's suggestion, plaintiff wrote out a longhand statement reciting that the parties had agreed "that the buyer [Wain] will cause himself to be elected to the board of directors" and "that the by-laws be amended by the stockholders (the buyer) to require that all action by the board of directors must be unanimous." (Bracket but not parenthesis added.) At the bottom of this sheet is written the following: "Investment contributed equally by each of undersigned, each of whom is entitled to 1/3 of stock herewith purchased." This was signed by Wain, Rosenus and Shane. The discussion with respect to this addendum was carried on in plaintiff's presence. Ziffren told plaintiff that he "wanted her to understand who was buying the stock, in what percentages they were buying the stock, and that these people each owned as principals one-third of the stock being purchased from her." Ziffren testified that prior to signing the papers he said to plaintiff: "Now, Mrs. Lewis, you understand that you are selling your stock; that by selling your stock the purchasers have full right and authority to do anything they desire with the corporation or any of its assets; that you can be removed as president and director immediately or at any time; and that you have no rights of any kind, except that if you decide to exercise your option and do exercise the option in accordance with its terms, then you will have the right to repurchase the stock?"

Plaintiff never exercised the option although an escrow was opened for that purpose on September 19, 1951. Defendants withdrew their stock and other documents on September 26 upon plaintiff's failure to deposit the money.

Plaintiff filed this action in March, 1953. Defendants set up the defense of laches by alleging that in the early part of 1953 and prior to the filing of this action the value of the properties of Selegna substantially increased by virtue of a rise in the market price of oil sold by the corporation and also by reason of an increase in the production of its wells

due to remedial work which had been performed under the direction of defendants only a short time prior to the commencement of this suit.

The court found the transaction was not a loan and exonerated defendants of the charge of fraud, undue influence and duress, and sustained their defense of laches. The title of the defendants to the stock was quieted.

The money judgment in favor of defendants on their cross-complaint grows out of the execution by plaintiff, as president of Selegna, of two promissory notes in the principal sums of $5,000 and $200 respectively, payable on demand to a New York bank. The existence of these notes was not known to defendants and was not indicated by the balance sheet. She signed a memorandum when the deal was being consummated on February 17 that there were no outstanding contracts or commitments of Selegna except the contract for the sale of oil to General Petroleum. Defendants paid these notes, together with interest and certain additional costs and expenses totaling in excess of $5,355. Recovery was sought on the theory that by the above mentioned memorandum plaintiff had warranted the financial condition of Selegna as of February 17, 1951, and that there had been a breach thereof by her, causing damage to defendants in the amount they were required to pay to discharge these obligations of Selegna.

Plaintiff contends that the court erred in finding that: (1) the transaction was not usurious; (2) there was no undue influence or duress; (3) the consideration paid to her was the fair market value of Selegna's stock on February 17, 1951. She further contends (4) that the court erred in excluding certain evidence, and (5) that the finding that defendants were damaged in the sum of $5,355 is not supported by any evidence. None of these contentions is well taken.

Plaintiff's position that the court erred in finding the transaction was not usurious simply means she is arguing that the evidence is insufficient to support the finding that the deal was in fact what it purported to be, viz., a purchase and sale of the stock of Selegna with an option in plaintiff to repurchase the same. Likewise, her claim that the court erred in finding there was no undue influence or duress, and that the consideration represented the fair market value of the stock is merely another way of saying that the evidence is insufficient to sustain these findings also.

In passing on the sufficiency of the evidence to support the findings it must be remembered that an appellate

court will view the evidence in the light most favorable to the respondent; will not reweigh the evidence; and will indulge all intendments and reasonable inferences which tend to sustain the findings of the trial court. (*Berniker* v. *Berniker*, 30 Cal.2d 439, 444 [182 P.2d 557].) ■ Conflicts in the evidence, of course, must be resolved by the trier of the facts. ■ Furthermore, in reviewing the sufficiency of the evidence the task of an appellate court ends when it finds substantial evidence, contradicted or uncontradicted, that supports the challenged finding. (*Crawford* v. *Southern Pac. Co.,* 3 Cal.2d 427, 429 [45 P.2d 183].)

■ Whether a business transaction is usurious depends on its own facts. ■ The presumptions are that such transactions have been fair, regular and legal. (Code Civ. Proc., § 1963, subds. 19 and 33; *Hersum* v. *Latham,* 120 Cal.App.2d 325, 328 [260 P.2d 988].)

■ Applying these principles, it is apparent that the evidence to which we have referred amply supports the findings that this was a purchase and sale transaction with an option to repurchase and that there was no fraud, duress or undue influence. The testimony of Goodstein and Ziffren clearly justify such findings. Wain made it plain to Goodstein soon after the latter's inquiry about refinancing or bailing plaintiff out of her financial difficulty that he and his associates were not interested in making a loan and that the proposed loan would be usurious; that they were only interested in a deal where a capital gain could be realized. It was then that a sale of the stock with an option to repurchase was suggested, and Goodstein advised Wain that such a transaction would be legal. Such advice by plaintiff's counsel, who had gone into the question to the point of looking up a California appellate decision that he felt justified his opinion, supports an inference that he (Goodstein) regarded the proposed sale and option to repurchase as in fact being exactly that kind of a deal, and not a subterfuge for a usurious loan for obviously such a scheme would have been illegal. It was after this that plaintiff called on Wain. He also told her that he and his associates were not interested in making a loan; but were interested in getting a capital gain; and that the only basis upon which they could handle the deal would be a sale with an option to repurchase. Plaintiff did not desire to sell but her creditor, Mr. Hurd, who had all the stock in Selegna pledged as collateral to his loan, was pressing for payment in a vigorous and unrelenting manner.

So, after leaving Wain's office, plaintiff went to see her own attorney, Goodstein. They undoubtedly discussed the precariousness of plaintiff's financial position and Wain's proposition. In any event it is indeed significant that Goodstein called Wain and told him that he had advised Mrs. Lewis to sell the stock in Selegna with a written option to repurchase. Later Goodstein began the preparation of legal papers to effectuate the transaction. The trial court was abundantly justified from this chain of circumstances and these conversations in concluding that plaintiff fully understood the character of the deal and that it was not a loan.

The meticulous and painstaking explanation of the deal that Mr. Ziffren made to plaintiff at the bank before the papers were signed; the fact that she wrote out in her own handwriting a statement that "the buyer," Wain, would be elected to the board of directors and that "the buyer" would have the by-laws amended to require that all actions of the board must be unanimous; the signed statement by her attorney that he was familiar with all details of the transaction and had advised her fully as to her rights and liabilities; and her presence during the discussion between Wain, Rosenus and Shane that this investment was contributed equally by each of them and that each was entitled to one third of the stock purchased further supports and fortifies the finding that this was a sale of the stock with an option to repurchase.

In her reply brief, plaintiff notes a number of items of evidence relating to the negotiations and circumstances and conduct of the parties surrounding and connected with the transaction together with inferences and arguments therefrom which she insists prove that this was a usurious loan. To follow her theory and to reach her conclusion this court would be compelled to reevaluate the evidence and credibility of the witnesses, draw inferences contrary to those of the trial judge and resolve conflicts in her favor. These, of course, are not functions of a reviewing court.

Plaintiff argues that a fiduciary relation existed between Wain and plaintiff. The mere fact that Wain's accounting firm audited the books of Selegna does not as a matter of law establish a fiduciary relationship between them. From an evidentiary standpoint, the testimony did not require, and in fact did not justify, a finding that such a relationship existed between Wain and plaintiff. It was made clear from the outset that the parties were dealing at arm's length and that others were associated with Wain in this

proposed venture. For example, when Goodstein first inquired of Wain about refinancing or bailing plaintiff out of her financial predicament Wain advised him that "he and his associates" were not interested in making a loan; that "*they* were only interested in a transaction wherein *they* could realize capital gains." (Emphasis added.) This was the testimony of plaintiff's lawyer. He further testified that when he called Wain to advise him he had recommended to Mrs. Lewis that she sell the stock in Selegna with an option to repurchase, Wain replied that "he would talk to his associates" and call him back. It is true that the names of Wain's associates were not known until the parties met at the bank to sign the papers. She did, however, meet them there and learned prior to the consummation of the deal that they were interested in it with Wain. ■ Plaintiff argues, however, that a fiduciary relationship was disclosed by Wain's testimony that he told Mrs. Lewis "not to go into the deal." Just how that statement disclosed such a relationship, or a breach thereof if it were otherwise established, is difficult to see since it admonished her against going into a deal in which he was interested on the other side, and particularly since she did not heed his comment. This statement of Wain's does, however, lend support to the court's finding that there was no duress or undue influence. The finding gathers further support from the fact that plaintiff was represented at all stages of the transaction by her own trusted and faithful counsel. He was with her when all the parties met at the bank to sign the papers and consummate the matter. When the question arose regarding Wain's going on the board of Selegna and requiring unanimous action, her attorney advised her this was a reasonable request. His statement in writing at the end of the purchase and sale agreement that he was "familiar with all details of this agreement" and had "advised the seller [plaintiff] in this transaction fully as to her rights and liabilities . . ." furnishes further support for the finding that there was no duress or undue influence and the additional finding that no fraud was involved. It is true this matter appears to have been rushed to a hurried conclusion—so hurried that Mr. Ziffren did not have sufficient time to investigate all the asserted facts and to prepare legal papers which he regarded as adequate to cover all aspects of the deal. This explains why he expressed the hope that the papers which he had prepared would not be signed. It also explains why he required Goodstein to further state that he

had "advised the buyer to rely upon the representations" contained in the agreement. The hurried conclusion of this matter was necessitated by the pressure Mr. Hurd was exerting to collect his overdue loan. The foreclosure sale of Selegna stock was just two days away. Plaintiff, of course, was anxious to get additional time to work out her financial problems. She was confident time was all she needed and that seven months was more than adequate for her purpose.

It was stipulated that as of February 17, 1951, the fair market value of the assets of Selegna was between $275,000 and $350,000. The balance sheet of December 31, 1950, which represented the condition of the corporation on February 17, 1951, "except for ordinary current transactions in the regular course of business," disclosed the current liabilities of the corporation to be $33,747.66 and that it still owed the Empire Trust Company $104,397.69. These items added to the $125,000 paid for the stock give a total of $263,145.35. In addition, in handling a deal of this character where there was not adequate time to check carefully all the details, it would be reasonable to make some fair allowance for unknown and undisclosed liabilities such as, e.g., unpaid taxes. This item is particularly apropos here for the United States Treasury Department made an additional assessment for the fiscal year ending March 31, 1948, of $24,043.06. There were also the two notes of $5,000 and $200, respectively, payable to a New York bank, which are the subject matter of defendants' crosscomplaint and may therefore be eliminated from consideration here. There was, however, another claim for $3,000. Thus, excluding the notes, there were some $27,000 in claims that showed up. The record does not disclose the disposition of these claims. Hence it is apparent that defendants paid out and were obligated to pay out more than $263,000 and adjust claims of some $27,000 in order to acquire the Selegna stock. Considering the stipulated value of Selegna's assets, its known liabilities and the other claims against it, the finding that $125,000 was the fair market value of Selegna's stock is not without reasonable and substantial evidentiary support.

Plaintiff, however, argues in her reply brief that a stipulation as to the fair market value of the assets will not support a finding as to the fair market value of the stock. Hence, she avers, this finding is not supported by any evidence. She is in error as to her conclusion because she fails to appreciate the additional factors that the court had before it in arriving at a fair consideration for the stock. The court was ad-

vised of the corporation's debts and the claims asserted against it, the fact that all its stock was held by one person and did not appear to have been listed on any exchange or to have a value in the open market, the lack of successful management of the affairs of the corporation, and the fact that its products were disposed of through a contract with a major oil company. ■ In such circumstances the court, in *Treb-elhorn* v. *Bartlett*, 154 Neb. 113 [47 N.W.2d 374, 379], citing *Zinn* v. *Ex-Cell-O Corp.*, 24 Cal.2d 290 [149 P.2d 177], stated the rule as follows: "The actual value of corporate stock which has no market value, that is, where it is all common stock closely held and not listed or actively traded in on any stock exchange . . . is ordinarily determinable from the then net worth of the corporation divided by the number of bona fide shares issued and outstanding. For that purpose, evidence of the factors and elements, such as assets, liabilities, and all other matters pertinent to the value of the particular corporation involved, may be admitted and considered." (To the same effect see *Kendrick* v. *Schwartz*, 69 Cal.App.2d 171, 175 [158 P.2d 405]; *Gorham* v. *Massillon Iron & Steel Co.*, 284 Ill. 594 [120 N.E. 467, 471]; *Arneson* v. *Nerger*, 34 S.D. 201 [147 N.W. 982, 985]; 31 C.J.S., Evidence, § 183, p. 901.) It is thus apparent that in arriving at the fair market value of Selegna's stock the court was not limited to the stipulation of the fair value of the corporation's assets, and that the court had an adequate basis for arriving at such value.

■ In an effort to show that the consideration for the stock was inadequate, plaintiff asserts that she received only $49,320.92 whereas the lowest figure of the stipulated fair market value of the assets of Selegna was $275,000. The fallacy of this comparison is obvious because in arriving at the fair market value of the stock the debts and claims against the corporation must be taken into consideration whereas they are not involved in fixing the value of the assets. The debts alone, exclusive of the unliquidated claims, amounted to more than $138,000. Thus an erroneous attempt is made to compare items that are simply not comparable because they include different factors.

In saying that she received only $49,320.92 as consideration for her interest in Selegna, plaintiff misconceives the record for such is not the fact. It is true that $10,000 out of the $125,000 purchase price was used for remedial work on the wells. This, however, was done at her request. She thought

that such an expenditure would not only increase the immediate value of the wells but would also increase their long range value. It was upon the basis of plaintiff's recommendation and the prospect of an immediate increase in production that defendants were persuaded to raise the purchase price from $115,000 to $125,000. Plaintiff was naturally interested in having this remedial work done on the wells for she felt it would greatly increase their value, and, no doubt, in part, accounted for her willingness to pay later a substantially increased price for the stock through the exercise of her option to repurchase. As a bookkeeping item this $10,000 for remedial work on the wells was credited against the amount that plaintiff owed the corporation, which was $65,679.08. This was no doubt a proper bookkeeping procedure since she was making this money available for the corporation's use and benefit. Because of this bookkeeping entry, plaintiff argues that it is thus established that she is expected to pay the balance of her account to Selegna and consequently the consideration which she received for her stock is thereby reduced by more than $55,000 and the inadequacy of the consideration therefor proved. Plaintiff, however, puts herself in an unnecessarily disadvantageous position as to this indebtedness. The trial judge inquired about this matter. He asked Mr. Shane: ''What, if anything, was. said about the fact that there was on the books of the company an indebtedness by her of some $65,000? The Witness: Nothing was said. Inferentially it was indicated that we didn't consider that a real obligation and one that would ever be considered to be paid by Mrs. Lewis.'' From all the facts and circumstances in this case it is a fair inference that all the parties considered that plaintiff's interest in Selegna was being purchased and sold for a net figure of $125,000 with an understanding that $10,000 of this amount would be set apart for remedial work on the wells, and without any idea that plaintiff would be expected to pay the account on the books against her. Crediting her account with the $10,00 was simply a matter of bookkeeping convenience. In any event, the entry of this credit does not establish that plaintiff is expected to pay the balance of that account. This inference is fortified by the conduct of the defendants. They filed a cross-complaint to recover the amount paid out on account of two undisclosed promissory notes but did not seek to recover any balance due Selegna from plaintiff. The judgment was signed approximately two years after plaintiff's option to repurchase had expired and no attempt to collect this account appears to have been made.

Plaintiff argues in her reply brief that "as a matter of law the doctrine of laches is not applicable." She bases this on the theory that the books of Selegna still showed an indebtedness of some $55,000 from her to the corporation and that it or defendants were entitled as of the time this action was commenced to sue her for this account and that as long as it remained on the books she is entitled to raise the defense of usury and therefore she could not be guilty of laches. This argument is based on two false premises. The first is, as heretofore pointed out, that this was not a loan transaction and usury was therefore not involved. The second is, as we have also noted, that when this deal was made none of the parties regarded this account as one plaintiff was expected to pay.

Plaintiff does not challenge the sufficiency of the evidence to sustain the finding of laches. This was a question of fact (see *King* v. *Los Angeles County Fair Assn.*, 70 Cal. App.2d 592, 596 [161 P.2d 468]) and the evidence was clearly ample to support such finding.

Plaintiff complains of the exclusion from evidence of the depositions of defendants and the failure of the court to consider the depositions of Wain and Rosenus. Although the depositions had been filed earlier and portions had been used for impeachment purposes, they were not actually offered in evidence until during the course of the closing argument on behalf of plaintiff. The admission of the depositions at this point would have required the court to reopen the case; would have necessitated reading the depositions into the record; and the consequent determination by the court of the admissibility of such portion of the depositions as to which objections had been made when they were taken and would possibly have occasioned the introduction of further evidence and further argument on behalf of defendants. Because of the lateness of the offer the court did not abuse its discretion in refusing to admit the depositions in evidence.

Plaintiff now argues that by reason of an incident that occurred during the course of the trial the deposition of Wain was in evidence and that since the court admittedly did not read it prejudicial error was committed. This incident took place about the middle of the trial when counsel for plaintiff was examining Wain. The record to which our attention is directed reads, in part, as follows:

"Q. (By Mr. Cummins): I show you a copy of the deposition taken of you on Wednesday, July 8, and Thursday, July 9, 1953, and direct your attention to page 109 thereof,

Mr. Wain, or 108 at the bottom of the page, and ask you to read the question commencing on line 24, page 108: 'And you disclosed to Mrs. Lewis——'

"The Court: No, it is in the record already.

"Q. (By Mr. Cummins): Will you read it, Mr. Wain?

"The Court: How far do you wish him to go?

"Mr. Cummins: Down to line 23 on the next page.

"The Court: All right. Let the witness read and then, of course, you can read such portions into the record as you desire Mr. Cummins." Plaintiff contends the court's observation, "No, it is in the record already" establishes that the deposition was in evidence. Just what was meant by this comment is not entirely clear. It may well have meant that the particular testimony to which counsel was directing the attention of the witness was already in the record. In any event, when considered in the light of the immediate direction to counsel to "Let the witness read and then, of course, *you can read such portions into the record* as you desire Mr. Cummins" (emphasis added), it becomes certain the court did not understand the deposition was in evidence. Furthermore, when counsel offered the deposition of all the defendants in evidence during his closing argument he made no suggestion to the court that the Wain deposition was already in evidence as a result of the foregoing incident. His argument here is obviously an afterthought.

In examining Rosenus, counsel for plaintiff directed his attention to a portion of page 7 of his deposition. The court thereupon, in the interest of clarity, suggested that "In addition to what you read from the deposition on page 7 I think the following four lines should be read. Line 20:" The court then apparently read those lines consisting of a question and answer into the record. After a colloquy between the court and counsel relative to uncertainty in the portion of the deposition to which counsel had directed the witness' attention as to when a particular event took place, the court observed: "Then he goes on and adds what I have read." Plaintiff argues that the action of the trial court is "gratuitously reading into the record portions of the deposition" and "apparently" extending "his perusal of the Rosenus deposition beyond the portion read into the record by Mr. Cummins at that time" constituted "a submission and offer of the entire" deposition to the court as evidence since there is no authority for the introduction of a portion of a deposition. This is a synthetic argument. True, the court read four

lines beyond the portion read by counsel, and "gratuitously" read these lines into the record but only for the purpose of clarifying the previous answers. That calling attention to this additional question and answer served such purpose is demonstrated by counsel's comment: "That does clarify it, your Honor, thank you." The court had had difficulty, although he had read it three times, in understanding what the witness meant by one of the answers in the portion of the deposition to which counsel had directed attention. The court was seeking clarification and properly drew the further question and explanatory answer to the attention of counsel and the witness. To say that this incident constituted a "submission and offer of the entire" deposition in evidence is to completely ignore the procedure by which a deposition is offered in evidence.

 Plaintiff also complains that the court erred in excluding from evidence a transcript of a monitored conversation between counsel for plaintiff and defendant Shane. This conversation occurred shortly before the complaint in this action was filed. It was initiated by a telephone call from plaintiff's attorney to Shane, inquiring whether at that time Shane would be agreeable to a resale of the stock of Selegna if $200,000, in cash, were made available for such purpose. This was some two years after the transaction, which was the basis of this suit, had taken place. This conversation was neither relevant nor material to any of the issues made by the pleadings. There was clearly no abuse of discretion or prejudicial error in rejecting such proffered evidence.

 Plaintiff's final argument is that the finding that defendants "were damaged in the sum of $5,355 is not supported by any evidence." Her position cannot be sustained. By cross-complaint recovery of damages is sought for a breach of warranty contained in the contract for the sale of the stock which was entered into between Mrs. Lewis and the defendants on February 17, 1951. Attached to the contract is a balance sheet of Selegna dated December 31, 1950. The contract provides that such balance sheet "fully and accurately reflects the condition of the company as of this date; that all assets listed thereon are owned by said company and there are no liabilities, contingent or otherwise, of the said company." As previously noted, Mrs. Lewis signed a handwritten memorandum, at the time the deal was closed, stating "There are no contracts or commitments of Selegna . . . of any kind written or oral except the contract

for sale of oil to General Petroleum . . ." It is alleged in the cross-complaint that Mrs. Lewis had, prior to February 17, 1951, executed and delivered two promissory notes in the principal sums of $5,000 and $200 respectively, as president of Selegna, which obligated the corporation to pay such amounts with interest on demand to the Chemical Bank and Trust Company of New York. The existence of these notes was not known to defendants and was not indicated by said balance sheet although they were outstanding commitments of Selegna. The answer to the cross-complaint admits the execution and delivery of these notes hence proof of these facts was unnecessary. The fact that the notes were not disclosed by the balance sheet attached to the contract of February 17, 1951, is disclosed by an examination of the balance sheet. Furthermore, "there was no record in the books" of these notes. The statement executed by Mrs. Lewis as a part of the contract of February 17, 1951, constituted a warranty as to the financial condition of Selegna as of that date (*Orton* v. *Embassy Realty Associates*, 91 Cal.App.2d 434, 441 [205 P.2d 427], although the word "warrant" was not used, for no particular words are necessary to create a warranty. (*El Zarape Tortilla Factory* v. *Plant Food Corp.*, 90 Cal.App.2d 336, 345 [203 P.2d 13]; *Stott* v. *Johnston*, 36 Cal.2d 864, 869-870 [229 P.2d 348, 28 A.L.R.2d 580].) A breach of such warranty rendered Mrs. Lewis liable to the The testimony of Wain disclosed that suit was commenced purchasers of the stock for damages suffered by reason of the existence of contracts not disclosed by the balance sheet. upon these notes by the New York bank and judgment granted; and that it cost the defendants approximately $5,800 (including court costs and attorney's fees) to settle the matter. Thus the admissions in the pleadings, the documents executed by Mrs. Lewis, and the testimony of Wain amply justify a judgment in favor of defendants on their cross-complaint and support the amount therein awarded.

The evidence and the reasonable inferences therefrom amply support the findings essential to sustain the judgment.

The judgment is affirmed.

Moore, P. J., and McComb, J., concurred.

A petition for a rehearing was denied December 3, 1954, and appellant's petition for a hearing by the Supreme Court was denied January 3, 1955.