[Civ. No. 20517. Second Dist., Div. Two. Oct. 14, 1955.]

COUNTY NATIONAL BANK AND TRUST COMPANY OF SANTA BARBARA (a National Banking Association), as Trustee, etc., Respondent, v. BYRON L. SHEPPARD et al., Appellants.

Alfred R. Edwards, in pro. per., Nathan Newby, Jr., Weldon, Haines & Hass and Wendell P. Hubbard for Appellants.

Price, Postel & Parma, H. Clarke Gains and Lillian M. Fish for Respondent.

FOX, J.—These appeals are from a judgment in an action for declaratory relief instituted by, plaintiff as the successor trustee of a testamentary trust created under the will of Alfred Edwards. The complaint asked for a determination of the rights and duties of various parties to a controversy relating to the distribution of a part of said trust following the death of Mabel Edwards Morrison, widow of the testator. The appeals are from a judgment in favor of plaintiff's position respecting the disputed rights of the parties.

An agreed statement has been submitted. It appears therefrom that Alfred Edwards died testate in 1926. Surviving him were his widow Mabel and four children, namely: Alfred, Elizabeth (later Mrs. Jones), John and Richmond. Decedent's will provided for the creation of a trust, whose terms were

incorporated into the final decree of distribution dated February 1, 1930. Plaintiff was appointed successor trustee thereof in July, 1930.

By the terms of the trust, as carried over into the final decree, the net annual income thereof was to be distributed to the following beneficiaries: one-half to the widow, Mabel, during her lifetime, and one-eighth to each of the four children aforesaid during their respective lives. The instrument then provides: "Each and all of *such payments* are to be made for the sole and separate uses of the beneficiaries, and *the same* are not to be deemed or held liable in any possible event for the debts, control or engagements of such beneficiaries or any other person, and are to be free from the control of any husband, and are not to be subject to any transfer, mortgage, pledge or assignment by them or either or any of them." (Emphasis added.) The effect of this language as creating a spendthrift trust was established in the case of *Estate of Edwards,* 217 Cal. 25 [17 P.2d 116], to which later reference will be made.

It is further provided by the terms of the trust that "Upon the death of my said wife, my said trustee shall convey her share of the principal of the trust fund, income of which she shall have previously received, to my said children, share and share alike, the issue of any deceased child to take the parent's share equally per *stirpes* and not per capita.

"Upon the death of each of my children, the trustee under this will shall convey his or her share of the principal of the trust fund, the income of which he or she shall have previously received, to such person or persons, and in such way or manner, as such child shall direct in and by his or her last will, if any, and in case such child shall die intestate, his or her share of the principal of the trust fund, the income of which he or she shall have previously received, shall be paid or conveyed to and among the issue of such child then living in the same way, manner and proportion as if such child had then died seized of his or her proportion of said principal fund and intestate [sic]. And in case any child of mine shall die intestate and without leaving issue living, then his or her share of such principal trust fund, upon which he or she shall have previously received the income, shall be paid or conveyed to his or her heirs at law."

Subsequent to the execution of the will providing for the testamentary trust last mentioned, Richmond, Alfred, and John became indebted to their father in various amounts,

which were evidenced by individual promissory notes executed in favor of the decedent prior to his death. No modification of the terms of the will was undertaken by the father following the making of the loans.

Following the death of the testator, the executor of his will brought action on the outstanding notes, and reduced them to judgment. The judgments so obtained were: (1) against Richmond on November 10, 1927, for $4,770.25; (2) against John and his wife Sallie on November 10, 1927, for $4,302.30; and (3) against Alfred on October 28, 1928, for $17,996.36. At the time plaintiff became successor trustee, these judgments were a part of the corpus of the trust estate. These judgments were periodically renewed and the accrued interest became a part of the principal in each instance at the time of the renewal of the particular judgment. At the date of the death of the widow, Mabel, on November 4, 1949, the principal amount of each judgment, including accrued interest, was: Alfred—$63,270.12; Richmond—$17,622.81; John (and Sallie) $15,962.41.

On January 14, 1948, John, one of the beneficiaries under the trust, passed away, leaving two surviving children, Alfred and Anna (Gooding). After John's death, plaintiff filed a petition for instructions regarding the rights of his surviving children to take under the terms of the trust in the light of the judgment in plaintiff's possession against their father John. By an order of instructions to plaintiff issued on October 30, 1948, the court determined that John's surviving children were entitled to one-eighth of the principal of the trust estate as direct beneficiaries under the will of their grandfather, free of any claims against their father. This order also recited that there was, in the hands of plaintiff trustee, no interest in the trust corpus which might be applied to the payment of the judgment against John. After distribution following the death of John, the trust estate was held by plaintiff according to the following interests: 4/7 for Mabel, 1/7 for Alfred, 1/7 for Richmond, and 1/7 for Elizabeth.

Plaintiff trustee filed periodic reports and accounts of its administration of the trust, the eighteenth account current covering the period from December 17, 1948, to December 6, 1949. The order settling this account was made on May 1, 1950.

In the years intervening between the creation of the trust

and the death of the testator's widow, Mabel, certain beneficiaries of the trust executed the following assignments:

On November 19, 1932, Mabel executed an assignment in the sum of $7,500 to Richmond, and another for the same amount to John, to be paid out of her estate "in the event Nathan Newby, Jr., and Richmond A. Edwards shall be unable to recover legal title and remainder to" certain designated property from transferees of Mabel. On January 31, 1942, Richmond executed an assignment of the above claim to one of the appellants herein, Byron L. Sheppard, as security for the repayment of money advanced to Richmond by Sheppard.

On November 27, 1939, Richmond executed an instrument which, in the language of the agreed statement and the court's findings, "purported to assign to . . . Sheppard a one-eighth vested interest in said trust estate, subject to the life estate of . . . Mabel R. Edwards." This assignment was given as security for a judgment of $6,500 held by Sheppard against Richmond.

Alfred executed two assignments of his one-seventh interest in the trust to his former wife, Marie de Forest Emery, also an appellant herein. The first of these assignments was on August 30, 1949. The second occurred on November 4, 1949, the date of Mabel's death.

On November 9, 1949, Russell A. Bradley, a judgment-creditor of Richmond, caused a writ of garnishment to be issued and levied upon plaintiff as to any property of Richmond in plaintiff's possession. The writ was returned with the statement that plaintiff had no assets of Richmond which were subject to levy.

Up to the time of Mabel's death on the 4th of November, 1949, no part of the principal or interest on the judgments against Richmond, Alfred or John had ever been paid nor had any credits thereon been given under their beneficiary accounts. As of November 5, 1949, plaintiff claimed and credited to the beneficiary accounts of Richmond and Alfred their shares of the trust estate which became subject to distribution on Mabel's death, asserting thereby a right of retainer and setoff against the distributive shares of Richmond and Alfred as judgment debtors of the trust estate. On November 7, 1949, plaintiff executed partial satisfactions of the two judgments against Richmond and Alfred to the extent of its claimed right of retainer and setoff, based upon the value it set on the corpus of the estate. On November

7th and 12th, 1949, it caused two writs of execution to be levied against itself on the judgments held against Richmond and Alfred. The returns thereon contained the statement "not indebted."

Plaintiff's complaint sought a declaration of the rights and duties of the respective parties to the action relative to the assets of the trust estate, and with respect to various written instruments described in the complaint, at the date of Mabel's death. Answers were filed by Richmond individually and as administrator (later executor) of Mabel's estate; by Byron Sheppard, and Russell Bradley, who had served a writ of garnishment on plaintiff; by Elizabeth Edwards Jones, one of the trust beneficiaries; and by Sallie Edwards, and her children, Anna and Alfred, who are also the surviving children of John. Stipulations for appearances were filed by Alfred and Marie de Forest Emery, and a cross-complaint was filed by Sheppard.

In addition to finding the facts previously recited, the court found that on November 4, 1949, the value of the trust assets, exclusive of the judgments, was $64,436.83; that as of the time of trial (February 20, 1953) the trust estate, exclusive of the said judgments, had a value of $84,102.74; and that except for amounts which plaintiff might collect by way of retainer or setoff, the judgments held by plaintiff against Richmond and Alfred were worthless, as was the judgment against Sallie Edwards. The court's essential conclusions were (1) that plaintiff had the right to retain and set off that portion of the trust estate which would otherwise be distributable upon Mabel's death to Richmond and Alfred against the amount of the judgments it held against those beneficiaries; (2) that no portion of the judgments against Richmond and Alfred, as renewed, is to be held or treated as income, and all interest accruing thereon but unpaid prior to their renewal is deemed added to and a part of the principal; (3) that any collection and satisfaction of the judgments received by plaintiff by virtue of its retainer and setoff should be credited first against the principal of the judgments, and any balance credited against the interest accrued and due thereon; (4) that plaintiff had the right to write off as worthless any unsatisfied portions of the judgments against Richmond, Alfred and Sallie Edwards; (5) that all accounts previously filed by plaintiff and settled by the court have become final and are binding upon all the parties herein; and (6) that plaintiff had the right to distribute that part of the

trust estate distributable upon Mabel's death as prayed for in plaintiff's complaint. Judgment was entered accordingly.

Three of the appellants herein, Byron L. Sheppard, Alfred R. Edwards and Marie de Forest Emery, advance identical points as the bases of their appeals. Additional issues are raised by Richmond A. Edwards, appealing in his capacity as executor under the will of Mabel Edwards Morrision.*

Appellants initially attack the insufficiency of the evidence to support the court's findings as to the value of the trust estate. They complain specifically respecting the value affixed to two items forming a part of the trust corpus—35 shares of stock in the Cielito Company and 634 shares of the Edwards Estate Company. The trial court found that as of November 4, 1949, the Cielito stock was worth $25 per share, and that of the Edwards Estate Company $60 per share. While the record supports the Cielito finding, we are satisfied that the method adopted below to arrive at the value of the Edwards Estate Company stock was not an approved or proper one.

The Cielito Company was a real estate holding company with about 970 shares of stock outstanding. There was testimony that in 1949 there had been certain sales of its stock at $25 per share. In 1950 there was another sale of stock at $25 per share. Two witnesses testified that $25 was the reasonable value of this stock on November 4, 1949. The cross-complaint of appellant Sheppard also alleged the value of Cielito stock was $25 per share. Thus there was ample support for the court's finding. While this stock was unlisted, there were a number of private sales at $25 per share, presumably to persons who knew its true value. There was no showing that these sales were not free or fair or that circumstances existed which might impugn the validity of the price paid in these transactions. There was, therefore, no error on the part of the trial court in establishing the value of the Cielito stock.

The Edwards Estate Company stock valuation, however, was infected with error. That company was a closely-held family corporation whose stock was unlisted. There has never been a recorded sale of its stock. Its assets consisted of about 1,350 acres of ranch property on which there was an oil lease; another tract known as the Gulley Land, and several buildings in Santa Barbara. The testimony regarding the value

---

*Richmond Edwards was formerly administrator of the estate of said decedent.

of its stock came from two of plaintiff's officers, Mr. Kaufmann and Mr. Powers. Kaufmann did not testify as to the value of the assets of the company, stating that he was personally unfamiliar with the worth of the company's properties. His analysis was based upon his inspection of income statements and balance sheets and from information given him by one of the company's officers. He gave his opinion that the stock held by the trust was worth $30 per share, based upon its earnings and dividends, the lack of a market, and the fact that the trust owned only 22 per cent of a closed corporation. Powers gave several figures regarding the worth of the stock. He stated that in 1951 an appraisal of a block of Edwards stock was made for inheritance tax purposes in the course of the probate of a certain estate owning such stock. The appraisers set its value at $70. He testified that the book value of the stock, set up for income tax purposes, was $57.95 per share, but pointed out that this "value has not anything to do with the market value." He testified that as of November 4, 1949, the trustee set the figure of $60 as the value of the stock. However, he asserted that if the underlying real estate of the company were put up for sale or liquidated, it would yield a return of about $100 per share. Powers stated that he was personally unfamiliar with the value of the company assets. There was no testimony introduced with respect to the value of the property owned by the company.

It is at once evident that in proceeding to arrive at a value of the corporate stock for the particular purpose of the case at bar, the procedure to be followed is not governed by the rules, tests, or formulae frequently employed in fixing stock value of a corporation whose shares are listed on the market and widely distributed in the hands of the public. The method now generally sanctioned and adopted for valuing stock in a closely-held corporation whose stock is unlisted, and where there have been no sales, consists of ascertaining "the value of the property which they represent, assigning to each share its proportionate worth." (*Estate of Felton,* 176 Cal. 663, 668 [169 P. 392] ; *Stafford-Lewis* v. *Wain,* 128 Cal.App.2d 614, 625 [276 P.2d 157].) In the Wain case, this court had occasion to approve the following statement of the rule: "The actual value of corporate stock which has no market value, that is, where it is all common stock closely held and not listed or actively traded in on any stock exchange, is ordinarily determinable from the then net

worth of the corporation divided by the number of bona fide shares issued and outstanding. For that purpose, evidence of the factors and elements, such as assets, liabilities, and all other matters pertinent to the value of the particular corporation involved, may be admitted and considered.''

There is no good reason why this method should not have been applied here, especially in view of the purposes for which the valuation of the trust estate was required. The Edwards stock was closely held, unlisted, and has never been publicly or privately sold. Yet no evidence was introduced regarding the worth of its property, the value of its net assets, tangible and intangible, the amount and nature of its present and contingent liabilities, and other factors which would assist in the application of the appropriate yardstick of valuation. Neither Powers nor Kaufmann were qualified to provide such data, and both acknowledged their personal unfamiliarity with the intrinsic worth of the company's properties. Powers admitted that his value of the stock was based upon appraisers' estimates; but the basis of these estimates nowhere appears, nor is the method employed in the appraisers' calculations shown. Furthermore, such appraisal was made in 1951, two years after the time here in question. Additionally, though the court found the stock to be worth $60, it is clear from Powers' testimony that were the company liquidated, its physical assets would give a return of about $100 per share. It is also manifest that Kaufmann estimated the value of the stock by using the technique of capitalization of the net earnings of the corporation, which was unwarranted by the type of corporation involved. He was unable to show the value of the property represented by the stock, and this deficiency was aided by no other evidence. Yet this was a *sine qua non* of an attempt to fix the fair value of this type of stock.

The several estimates given as to the value of the stock— $30 per share by Kaufmann, based roughly upon 10 times the earnings of $3.10 per share, and Powers' figure of $57.75 as book value, $70 as the appraisers' market value, and $100 as the intrinsic value upon liquidation—indicate the disparities achieved by the departure from the simple rule here applicable, namely, computing the net assets of the corporation, and dividing this figure by the number of shares issued and outstanding. (*Estate of Felton, supra*; *Stafford-Lewis* v. *Wain, supra*.) Since the court was irremediably handicapped in arriving at a proper valuation by the absence of

evidence of the value of the net assets of the corporation, a retrial of this issue in conformity with the rules herein stated will be necessary. A correct valuation is of particular importance since, as will presently appear, plaintiff is entitled to a right of retainer against the amount of Richmond's and Alfred's share of the trust corpus available for distribution.

One of the pivotal questions in dispute is the propriety of the trial court's determination that plaintiff was entitled to satisfy the indebtedness of Richmond and Alfred to the trust estate, as evidenced by the judgments, by the exercise of the right of retainer out of their proportionate shares of the corpus available for distribution upon Mabel's death. Appellants contend that the failure of the court to recognize the assignments to Sheppard and de Forest Emery as being free and clear of any right of retainer or offset by plaintiff as trustee was error. This contention has no merit.

We shall proceed first to analyze the terms of the trust instrument, since there are certain features of its provisions to which attention should be specifically directed. In so doing, the office of the court is to ascertain the general scheme of the testator by a consideration of the instrument as a whole and to give effect to its scope and purpose as manifested by its language. (*Randall* v. *Bank of America,* 48 Cal.App.2d 249 [119 P.2d 754]; *Smith* v. *Bank of America,* 14 Cal.App. 2d 78, 83 [57 P.2d 1363].)

The dominant purposes of the testator, when he formulated the trust, are clearly and unequivocally expressed. There are three principal features disclosed therein: (1) Life estates in the *income* of the trust are granted to his wife, Mabel, and to his four children. Mabel is to receive payments amounting to one-half such income, while each of the four children is to receive one-eighth. As a part of the clause directing the payments of *income,* the testator has employed language indicating that the beneficiary's interest in ''each and all such payments'' shall neither be alienable by, nor liable for the debts of, the beneficiaries. A spendthrift trust with respect to the payments of income for the lives of the beneficiaries was thereby created. (*Estate of Edwards,* 217 Cal. 25 [17 P.2d 116].)

(2) It is next provided, in a separate paragraph, that upon Mabel's death, one-half of the *principal* of the trust estate is to be distributed to the surviving income beneficiaries, the issue of a predeceased child to take the share of its parent. It is of little consequence for present purposes whether the

interest of the beneficiaries in the principal to be distributed on Mabel's death be regarded as a present vested interest subject to defeasance or a future one contingent upon surviving Mabel. The significant element is that as to such part of the corpus the testator has made no attempt to provide that the beneficiaries' interests shall be inalienable, not amenable to claims of creditors, or otherwise restricted at the time appointed for distribution. In short, as to the one-half of the trust estate terminated upon Mabel's death and immediately distributable, there is no indication that such fund was to be immunized by spendthrift provisions.

(3) The last important feature of the instrument is that it gives to each of the children-beneficiaries a power of appointment by will of his share of the remainder of the trust estate. Upon failure of the donee to exercise such power, his share of the corpus goes to his issue, or to his heirs at law in the absence of issue.

■ Thus it readily appears that the testator has created a spendthrift trust with respect to all payments of *income* for the duration of the lives of the beneficiaries. (*Estate of Edwards,* 217 Cal. 25 [17 P.2d 116].) The language of the trust is specific in its declaration of this avowed purpose. However, with respect to the corpus distributable upon the happening of the contingency specified in the trust—Mabel's death—the testator has imposed no restraints or restrictions upon the freedom of the transferees to deal with it as their absolute property, nor does there appear to be any inhibition against its application to the payment of their just obligations at the time of the arrival of their right to receive it. Upon Mabel's death the trust terminated as to one-half of the original corpus, and said assets were released for their ultimate disposition to the beneficiaries. Had the testator desired to make this distribution of principal also subject to spendthrift provisions, he could have said so. He did not do so. Under the familiar principle of *expressio unius est exclusio alterius,* this omission leads strongly to the conclusion that, having assured a life income to the beneficiaries under the spendthrift clause relating thereto, there was no intention to apply a spendthrift provision to a part of the corpus to which the beneficiaries would have an immediate right upon Mabel's death. (See *In re Hall's Estate,* 248 Pa. 218 [93 A. 944, 2 A.L.R. 855]; *Meyer* v. *Reif,* 217 Wis. 11 [258 N.W. 391]; *Heise* v. *Wells,* 211 N.Y. 1 [104 N.E. 1120]; *Perabo* v. *Gallagher,* 241 Mass. 207 [135 N.E. 113]; *Epstein*

v. *Corning*, 91 N.H. 474 [22 A.2d 410] ; *Seattle First Nat. Bank* v. *Crosby*, 42 Wn.2d 234 [254 P.2d 732] ; *Estes* v. *Estes*, (Tex.Com.App.) 267 S.W. 709.) It is patent that the testator's solicitude was simply to provide a uniform life income to the beneficiaries. He saw no necessity to impress with any restraints a part of the principal whose distribution to them would in no way affect their continued receipt of the same proportionate share of income from the balance of the trust.

We pass now to a consideration of the reciprocal rights of plaintiff and appellants, bearing in mind the following: (1) Richmond and Alfred at all times had and have a present right to their share of the trust income protected by spendthrift provisions; (2) that they had a future right to a share in one-half of the principal, contingent upon their surviving Mabel; (3) that upon Mabel's death, they had an immediate right to their share of the trust assets released for distribution untrammelled by any spendthrift provisions, except for the effect of the assignments they executed and the asserted right of retainer by plaintiff. This last matter will now be examined.

It cannot be seriously questioned that the interest of Richmond and Alfred in the part of the corpus passing to them upon their surviving their mother was one they could validly assign prior to the happening of the contingency. (*Anglo California Nat. Bank* v. *Kidd*, 58 Cal.App.2d 651 [137 P.2d 460].) However, the interest of Richmond and Alfred was subject to judgments in the hands of the trustee *which had constituted a part of the trust estate from its very inception.* Because the income payments under the trust provisions were declared free from the claims of creditors, it was held in *Estate of Edwards*, 217 Cal. 25 [17 P.2d 116], that the trustee had no right to set off the amount of the judgments against trust *income* payments, since the all-inclusive language of the spendthrift clause showed an intent not to give the trust estate a position preferential to that of any other creditor.* At this time, however, we are concerned

---

*Although the Edwards case contains broad language relating to the application of the spendthrift provision to "distributive shares," it is evident that such language must be understood as being limited only to the payments of income, which was the subject of the controversy being decided. "It is elementary that the language used in any opinion is to be understood in the light of the facts and the issue then before the court." (*Porter* v. *Bakersfield & Kern Elec. Ry. Co.*, 36 Cal.2d 582, 590 [225 P.2d 223]; *Eatwell* v. *Beck*, 41 Cal.2d 128, 136 [257 P.2d 643].)

with a payment out of corpus not controlled by a spendthrift provision. ■ The principle applicable to this situation is stated in 1 Scott on Trusts, section 251, pages 1435-1436: "Where a beneficiary is under a liability to pay money into the trust estate, his interest in the trust estate is subject to a charge for the amount of his liability. This is an application of a broader principle than a person entitled to participate in a fund and also bound to contribute to the same fund cannot receive the benefit without discharging the obligation. . . .

"Where a testator leaves his estate in trust for several beneficiaries, one of whom was indebted to the testator, the interest of that beneficiary is subject to a charge for the amount of his indebtedness, unless the testator manifested an intention that his interest should not be subject to such a charge. In such a case, the beneficiary cannot compel the trustee to pay him the amount to which he is entitled under the trust without deducting the amount of his indebtedness. The other beneficiaries can insist that the trustee withhold such payments, since they are entitled to insist that the interest of the beneficiary who is indebted to the estate should be impounded to satisfy the indebtedness. *If the beneficiary should assign his interest, the assignee takes it subject to the charge.*" (Italics added.)

The foregoing equitable rule, commonly referred to as the right of retainer, is embodied in section 251 of the Restatement of Trusts: "If a beneficiary is under a liability to the trustee as such, his interest in the trust estate is subject to a charge for the amount of his liability." Comment (c) of section 251 discusses the enforcement of such a charge: "Where the interest of a beneficiary of a trust is subject to a charge, the trustee can properly refuse to pay him the amount to which he would otherwise be entitled without deducting the amount for which he is chargeable, and . . . he is under a duty to the other beneficiaries to do so."

The right of retainer being purely equitable in nature, and one affecting the rights of other persons interested in the estate, the court was correct in its conclusion that the trustee was entitled to retain the shares of Alfred and Richmond in satisfaction of their debts to the trust estate. Plaintiff's right was not limited to the enforcement by execution of a simple money judgment. It had the further remedy of impressing its right of retainer upon the distributive shares of Richmond and Alfred by withholding distribution to the

extent necessary to satisfy the judgments held by the trust estate. It would be unfair and inequitable to the others interested in the estate to allow a beneficiary to receive the fruits of an estate and at the same time to escape the reimbursement of his indebtedness to the estate. In the case at bar, the assignees are subject to the same equitable right which might have been asserted against their assignors. (Rest., Trusts, § 251, com. (d).)

To follow appellants' argument would mean that beneficiaries of the trust who were indebted to it would thus be enabled to escape a portion of their indebtedness to the trust and shift the same to other beneficiaries who had had no part in the creation of such indebtedness. The unfairness of such a result is obvious.

The main case relied on by appellants, *Estate of Polito,* 51 Cal.App. 752 [197 P. 976], is distinguishable in its facts. The court held that where the sole subject of distribution of an estate is *real property,* the probate court had no jurisdiction to set off "against a debt due the estate by an heir the undivided interest of said heir in the real estate of said estate." It also pointed out that the judgment docketed by a creditor of the heir had become a first lien upon the heir's interest in the real property and had priority over the judgment subsequently obtained by the administratrix of the estate. No such considerations appear in the instant matter. Here, we are dealing with a trust consisting of personal property, and with judgments against the assignors which are not only a part of the trust estate but antedate the assignments. Also distinguishable is *United States F. & G. Co.* v. *Mathews,* 207 Cal. 556 [279 P. 655], where the assignments transferring the heir's interest in an estate as security for a loan were duly filed with the papers of the estate and were prior in time to the assignor's defalcations which created his liability to the estate.

Appellants make certain contentions concerning the procedure by which the court effectuated the right of retainer, namely by crediting the distributive share of Alfred and Richmond against the principal amounts of the renewed judgments in the hands of the trustee. In the valuation of the estate as found by the court, the respective shares amounted to $9,205.26. It is argued that any money so retained should be credited first in repayment of the interest accruing under the judgments. While normally as between creditor and debtor such allocation is made of voluntary payments re-

ceived in the aggregate from one obligated to pay both principal and interest on his debt, we are not confronted with such a situation. In charging the amounts retained wholly to principal, the court below adopted an equitable course, since the primary obligation of Richmond and Alfred as beneficiaries indebted to the trust was to replenish the corpus thereof. The interest awarded on the judgments herein was in the nature of damages for detention of the debts due the trust estate. (*Nesbit* v. *MacDonald*, 203 Cal. 219, 222-223 [263 P. 1007] ; *Puppo* v. *Larosa*, 194 Cal. 717, 720-721 [230 P. 439].) Therefore, the payments retained by the trustee were, in effect, a return of capital to the trust estate, and were properly allocated to principal to make whole the impairment of the trust estate occasioned by the delinquency of Richmond and Alfred. (*Matter of Tietjen*, 5 Dem.Sur. (N.Y.) 350.)

 It is also urged that since the judgments in part consist of accrued but unpaid interest due at the time of each renewal, one-half of the amounts over and above the original judgments should be treated as income allocable to Mabel's account and payable now to her estate. In so arguing, appellants rely upon the settled rule that where the income of a trust estate is of a type which accrues from day to day, such as interest payments, the estate of a life beneficiary is entitled to an allocation of the income accruing in his lifetime when it is ultimately received by the trustee. (*Kahn* v. *Wells-Fargo Bank & Union Trust Co.*, 137 Cal.App.Supp. 775 [27 P.2d 672] ; Rest., Trusts, § 235.) This argument, too, is founded on a lack of recognition of the unorthodox nature of these judgments as a trust asset which makes the conventional rules of apportionment between life beneficiary and remainderman inapposite. The fallacy inherent in appellants' argument is that they fail to give proper consideration to the fundamental character of these judgments as *substituted trust capital,* which was the treatment accorded them by the trustee in his preparation of the accounts and by the beneficiaries in accepting them without protest. Although forming a part of the corpus from the inception of the trust, the judgments were dormant and unproductive in any practical sense. The trustee had no alternative but to retain them, since it is doubtful whether they had any market value in other than a sacrifice transaction. They were periodically renewed in the apparent hope that eventually a fund might come into existence out of which a return of corpus as repre-

sented by the successive judgments might be realized. Each renewal of the judgment, which constituted a new debt augmented by the amount of unpaid interest, was carried as a capital asset of the trust at its face amount, which of course did not reflect their true value. Their value, until Mabel's death, was of an aleatory character; and they acquired a posthumous value only to the extent that plaintiff was able to retain the amount yielded by the distributive shares of Richmond and Alfred in partial satisfaction of the judgments.

Confronted with the unusual situation thus presented, the trial court, sitting as a tribunal of equity, was clearly justified in allocating the entire sums retained by plaintiff to the principle of the trust estate. These judgments had, through the years, become appreciated in nominal value by interest accretions which were added to principal but which would have been lost but for the renewal of the judgments. The interest incorporated into the successive judgments was not "income" of the trust, but constituted an award of damages against Richmond and Alfred flowing from their detention of the sums due the trust estate. (*Nesbit* v. *MacDonald*, 203 Cal. 219, 222-223 [263 P. 1007]; *Puppo* v. *Larosa*, 194 Cal. 717, 720-721 [230 P. 439]; *Ghirardelli* v. *Peninsula Properties Co.*, 16 Cal.2d 494, 499 [107 P.2d 41].) Being part of a compensation for a loss to corpus, it was refundable as an integral part of corpus. It is significant that these enhanced judgments were carried as principal in the trustee's accountings to the probate court in place of the superseded judgments. This treatment was acquiesced in by all the beneficiaries and most recently approved by the order of the court settling plaintiff's eighteenth account current. This was tacit recognition by the parties that the amount of the judgments was a reflection of injury or impairment of the corpus of the trust estate, and that any collection thereon would, in equity, represent substituted trust capital and not income. In fact, the record is clear that not only was no income really produced from the judgments in Mabel's lifetime, but it was only the contingency of her death which made them collectible and which, as a practical matter, fixed their value in the amount of the distributive shares. This is further demonstrated by the fact that the amounts remaining unpaid upon the judgments after retainer have been ordered cancelled, to which none of the parties have objected. For the foregoing reasons, the court properly decided that there was no income in the trustee's hands allocable to Mabel's estate.

Appellants appear to suggest that plaintiff is in some way estopped to assert the right of retainer. Without raising such point as a separate argument, they refer to testimony by Alfred to the effect that plaintiff's trust officer, Mr. Starbuck, informed him that plaintiff was not going to collect the judgments, but that on Mabel's death they would be distributed the same as any other part of the corpus distributable under the trust. Mr. Starbuck died in 1949. Since Starbuck was dead and Alfred was an interested party, his testimony was not binding on the court. ██ In *Duff* v. *Schaefer Ambulance Service,* 132 Cal.App.2d 655, 669 [283 P.2d 91], this court pointed out in connection with this type of evidence that "two principles should be borne in mind. The first is that uncorroborated testimony as to an oral declaration of a deceased person is the weakest form of evidence and is open to suspicion; but where admissible, it will be weighed by the trier of facts the same as other evidence and may be disregarded where shown to be unconvincing or insubstantial. [Citation.] The second is that the trier of fact may reject the uncontradicted testimony of a witness provided he does not act arbitrarily. [Citation.] Among the relevant considerations in this respect are the character of the evidence, the motives of the witness, and his interest in the result of the case. [Citations.] The jury was not compelled to accept the testimony of appellant as to Levy's alleged promise, either because of the weakness of this type of evidence or because it was not satisfied with the veracity of appellant's testimony as an adverse party." This states the law here applicable.

Also without benefit of separate heading, appellants express dissatisfaction with the court's finding of the truth of plaintiff's allegation that despite the exercise of diligence on its part, it has been unable to find or seize assets belonging to the judgment debtors not exempt from execution. Their challenge on this score requires them to set forth in their brief, with appropriate reference to the transcript, the evidence showing that Richmond and Alfred were possessed of unexempt property which would have been amenable to execution in satisfaction of the debts. (See *Richard* v. *Richard,* 123 Cal.App.2d 900, 902-904 [267 P.2d 867].) Appellants have furnished us with no references to the record pointing out all the material evidence on this point, nor have they shown that any property allegedly possessed by Richmond or Alfred would not have been subject to any of the statutory

exemptions. It is not the province of an appellate court to act as counsel for either party to an appeal by prosecuting a search of the record for the purpose of discovering errors not pointed out in the briefs. (*Fox* v. *Erickson*, 99 Cal.App.2d 740, 742 [222 P.2d 452].) ˙ Appellants having the burden of showing error, it was incumbent on them to make it affirmatively appear that error was committed. (*Richard* v. *Richard, supra.*) Having ignored their duty to direct the reviewing court to the portion of the record which supports their claim of the existence of *unexempt* property upon which plaintiff might have had execution, having failed to set forth all the material evidence on the issue, and having failed to present this contention as a separate point under an appropriate heading supported by argument and authority, we must deem it to be without foundation and not requiring discussion. (*Kruckow* v. *Lesser*, 111 Cal. App.2d 198, 200 [244 P.2d 19] ; *Richard* v. *Richard, supra*; 4 Cal.Jur.2d, § 484, p. 318.)

The case is remanded for a retrial of the issue of the value of the Edwards Estate Company stock as of November 4, 1949, in conformity with the principles herein expressed and for recomputation of the amounts of the distributive shares of the trust beneficiaries. In all other respects the judgment is affirmed. Each of the parties to bear his own costs on appeal.

Moore, P. J., and McComb, J., concurred.

On November 8, 1955, the opinion and judgment were modified to read as above.

A petition for a rehearing was denied November 9, 1955, and the petitions of appellants Byron L. Sheppard, Marie de Forest Emery, Alfred R. Edwards and Richmond A. Edwards, as Executor, etc., for a hearing by the Supreme Court were denied December 9, 1955.